**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JOHNELL WALTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 21-cv-02532-JWB-ADM |
| | ) | |
| UNIFIED GOVERNMENT OF WYANDOTTE | ) | |
| County/Kansas City, Kansas as | ) | |
| Representative of | ) | |
| Kansas City Board of Public Utilities. | ) | |
| | ) | |
| Defendant. | ) | |

## <u>DEFENDANT'S MEMORANDUM IN</u>
## <u>SUPPORT OF SUMMARY JUDGMENT</u>

**COMES NOW** Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Defendant"), and provides the following Memorandum in Support of its Motion for Summary Judgment.

## I.    NATURE OF THE MATTER OF THE CASE

Plaintiff was a journeyman lineman working for the Kansas City Board of Public Utilities (the BPU), which provides electric and water utilities to Wyandotte County, Kansas.  On March 13, 2020, the BPU's Executive Director of Electric Operations instituted a directive limiting access to its Electric Service and Distribution Center (the ESDC), which houses the dispatchers for its linemen who are sent to respond to outages and emergencies in the County.  This directive was a direct response to the COVID-19 pandemic, which was still in its infancy at the time.  The directive barred access by any non-employees, and limited the number of employees who could enter the facility.  A week later, Plaintiff brought his grandchildren into the facility on his day off.  Plaintiff admits that the directive had been posted around the facility, and that he had seen it posted, but

that he simply did not read it. Plaintiff admits that he violated the limited access directive.  Plaintiff was accordingly disciplined for insubordination.  Because he was on probation for another recent discipline, his penalty was increased as required by the BPU's Employee Handbook, and the resulting penalty was termination.  Plaintiff claims that his termination was discriminatory under 42 U.S.C. §1981.

## II.     STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.      Johnell Walton ("Plaintiff") was a journeyman lineman for the Kansas City Board of Public Utilities (the "BPU"), working as a troubleman from March 12, 2013 until he was terminated on April 7, 2020. ECF Doc. 34 p. 2.

**Plaintiff's Prior Discipline**

2.       Plaintiff's first discipline at the BPU came on December 17, 2013. Ex. A, 45:3-8; Exhibit B, Deposition Exhibit 3.

3.      The December 17, 2013 discipline was issued because Plaintiff was tardy or failed to punch (clock in/out) six times. Ex. A, 45:16-20; Ex. B.

4.      Plaintiff testified about this rule violation:

> 6      Q.      Was this a fair discipline?
> 7      A.      It's the rule.
> 8      Q.      Did you think it was unfair that you
> 9   were disciplined for these six tardies or failed
> 10  punches?
> 11     A.      It's the rule.
> 12     Q.      Do you think the rule is fair?
> 13     A.      I didn't -- I don't feel like it's my
> 14  place to say whether it's fair or not. I do think
> 15  that the fact that you forget to clock out can be
> 16  looked at as unfair, but even if it is unfair, it is
> 17  the rule, and as long as they follow it unilaterally,
> 18  that kind of makes it fair because it applies to
> 19  everyone equally.

Ex. A, 48:6-19.

5.      Plaintiff's second discipline is dated June 18, 2014. Ex. A, 50:1-9; Exhibit C, Deposition Exhibit 4.

6.      Plaintiff was disciplined for violating workplace Rule 9 as stated in the Employee Handbook ("Rule"), Careless Workmanship, after reporting his radio missing and the radio being found broken in the BPU driveway. Ex. C.

7.      Plaintiff was assessed A-level discipline of a first warning and 90-day probation. Ex. A, 50:21-51:9; Ex. C.

8.      Plaintiff's third discipline is dated December 23, 2015. Ex. A, 107:17-108:2; Exhibit D, Deposition Exhibit 7.

9.      The explanation of circumstances for this discipline was a customer complaint, specifically that Plaintiff had informed a BPU customer to cut down telephone and cable lines from a pole to get a quicker response from those utilities. Ex. A, 108:3-12; Ex. D.

10.     Plaintiff was disciplined for violating Rule 9, Careless Workmanship, and assessed a B-level discipline of a second warning and 180-day probation. Ex. A, 111:20-112:3; Ex. D.

11.     Plaintiff was issued the B-level discipline because it was his second time violating Rule 9, which followed the BPU's disciplinary policies. Ex. A, 112:4-14.

12.     Plaintiff grieved this discipline but it was not withdrawn or changed. Ex. A, 112:24-114:1.

13.     Plaintiff's fourth discipline was approximately one month later, dated January 22, 2016. Ex. A, 114:4-16; Exhibit E, Deposition Exhibit 8.

14.     The explanation of circumstances provides:

> While investigating a claim submitted to the Utility on January 8, 2016, it was discovered that Johnell Walton and Greg Rico left an unsafe condition when they failed to detect/troubleshoot secondary voltage on the neutral conductor of the customer's service line after responding to a Fire

> Call/Arcing Wire in Meter Can at [redacted]  Dec. 21, 2015. Johnell Walton confirmed that he did not check voltage at the meter can which would have detected voltage on the customer's neutral. Greg Rico stated that he arrived late to the call and confirmed that Johnell Walton worked the Fire Call.
>
> Later that morning, Sterling Owens was dispatched to [redacted] and found an energized secondary conductor in direct contact with the neutral conductor on the customer's service line. Once he cleared up this condition, it removed voltage from the customer's neutral and ground at the house making it safe.

Ex. E.

15.     The basis of this discipline was Plaintiff not checking the voltage on a meter can, which can cause a fire. Ex. A, 116:20-24.

16.     Plaintiff was found to have violated Rule 9, careless workmanship, and Rule 26, violation of a safety rule, and was issued B-level discipline of a second warning and a 180-day probation. Ex. A, 118:15-23; Ex. E.

17.     The BPU could have issued a C-level violation, as it was Plaintiff's third violation of Rule 9, but the BPU did not. Ex. A, 118:24-119:13.

18.     Plaintiff's fifth discipline resulted in his termination in December of 2016. Ex. A, 121:6-10.

19.     Plaintiff's union grieved his termination and took the matter to an arbitration. Ex. A, 132:17-22.

20.     The misconduct for which Plaintiff was terminated was a violation of Rules 21 and 26 and Section 8.013 of the Employee Handbook for having his driver's license suspended three times between February 22, 2014 and September 30, 2015, driving a company vehicle during this time, and not informing the BPU about the suspensions. Exhibit F, Deposition Exhibit 9, p. BPU000111-12.

21.     The independent arbitrator hearing Plaintiff's grievance on September 22, 2017 in an award issued on November 28, 2017 found:

> The evidence is clear and convincing that the Grievant violated Section 8.013 by failing to report his suspensions to the Company and continuing to drive a Company vehicle while his license was suspended. The Grievant knew or should have known that he needed to report each of his three suspensions to the Company. Further, Grievant's explanations concerning his lack of knowledge that his driver's license had been suspended three times is simply not credible. Accordingly, the Company has met its burden of proof with clear and convincing evidence that the Grievant committed the misconduct for which he was charged.

Ex. F, p. BPU000115.

22.     The arbitrator however concluded that the BPU failed to follow its rules on driver's licenses by not maintaining records on Plaintiff's driving record on a periodic basis and thus should have known of the suspensions sooner. Ex. F, p. BPU000116.

23.     The arbitrator therefore concluded that while Plaintiff violated BPU policy, the discipline of discharge was too severe. Ex. F, p. BPU000117.

24.     The arbitrator thus ordered, eleven (11) months after Plaintiff's termination, that Plaintiff be "reinstated but without back pay due to the Grievant's culpability stemming from his clear violation of Company policies requiring Grievant to possess a valid driver's license." Ex. F, p. BPU000117.

25.     Plaintiff's sixth discipline was dated January 17, 2020. Ex. A, 153:24-154:7; Exhibit G, Deposition Exhibit 11.

26.     The explanation of circumstances on this conduct memorandum reads:

> On January 17, 2020 Johnell Walton left an unsafe condition at the intersection of Park Drive and 19th Street, when he left a downed span guy on the ground which could have become energized. In addition, he left an unsafe condition across the street, when he failed to clear up downed electrical lines and equipment on the sidewalk next to a commercial customer. I was informed by Antonio Marin of the problem and we met

with Johnell Walton for him to clear up the downed wires and make both locations safe.

Ex. G.

27.    A span guy is a piece of wire that runs from one pole to another pole to help stabilize and secure the pole. Ex. A, 154:13-17.

28.    The originator of this conduct memorandum was Eric Clark, Plaintiff's supervisor, and Plaintiff agreed that the "I" referenced in the conduct memorandum was likely Clark because he remembers going to the scene with Clark and Tony Marin. Ex. A, 155:11-20.

29.    Plaintiff was disciplined for violating Rule 19, negligent or unsafe use of property, and issued a B-level penalty of second warning and 180-day probation. Ex. A 155:21-24; Ex. G.

30.    Plaintiff does not believe that he grieved this discipline. Ex. A, 155:25-156:1.

31.    At the scene, Marin and Clark had Plaintiff cut down the dangling wire, and Plaintiff testified that this wire was their concern. Ex. A, 160:21-161:8.

32.    Plaintiff was disciplined a seventh time approximately 62 days later, on March 19, 2020 for violating a COVID-19 limited access directive. Ex. A, 161:12-19; Exhibit H, Deposition Exhibit 12.

**COVID-19 Limited Access Rule**

33.    On March 13, 2020, the Director of Electric Operations, Jeremy Ash, wrote and issued a memorandum with the subject "ESDC Limited Access." Ex. H, p. BPU000089; Exhibit I, Deposition of Jeremy Ash, 33:2-10.

34.    This memorandum was issued the same day that Mayor David Alvey declared a state of emergency for Wyandotte County/Kansas City, Kansas due to COVID-19. Ex. I, 87:22-88:10.

35.     The memorandum directed that access to the BPU's ESDC (electric service dispatch center) facility was limited, "effective immediately" to the following four groups:

- Executive Director, Director, Superintendent, Supervisor ESDC
- Electric Troubleman or extra and force linemen assigned shifts
- Electric Dispatcher or extra and forced personnel assigned shifts
- Janitorial team

Ex. H, p. BPU000089.

36.     The memorandum continued that anyone outside those four groupings needed to be granted permission to enter the facility from Clark, Mike Fergus, or Ash. Ex. H, p. BPU000089.

37.     The memorandum stated, "[a]t no time during this limited access period should anyone be granted access that is not an employee or approved contractor of KCBPU." Ex. H, p. BPU000089.

38.     The memorandum warned, "[a]ny employee or contractor found to be in violation of this limited access action will be subject to disciplinary action and contractor status revoked." Ex. H, p. BPU000089.

39.     Ash's memorandum was posted in the ESDC facility. Ex. I, 30:25-32:19; Exhibit J, Deposition Exhibit 13.

40.     The ESDC facility is part of the BPU's Service Center, which Plaintiff referred to as the "trouble room." Ex. A, 162:10-21.

41.     The BPU's troublemen report to the ESDC, where they clock in, and where the dispatchers are located. Ex. A, 163:8:14.

42.     The memorandum was posted in multiple spots around the ESDC, including on a whiteboard in the troublemen's break area, twice on the door to enter the facility itself, and a tack board above the time clock. Ex. I, 30:25-32:19; Ex. A, 171:9-173:10; Ex. J.

43.     Ash testified about the impetus for this limited access directive:

11    Q.    And what prompted you to prepare the
12  second page of Exhibit 12?
13    A.    A couple of different things. First
14  thing being that's on or about the same day that the
15  Unified Government was taking action to reduce or
16·  sort of lock down, for lack of a better term, what
17  was happening in the city. We had taken some steps
18  to safeguard a lot of our other facility on that
19  campus.
20    This was prepared specifically, one,
21  because of the timeframe; two, we only have one
22  trouble dispatch center. If we were to have an
23  outbreak of COVID in there, it would be detrimental
24  to the continuity of our operations. There's --
25  there's six dispatchers and ten electric trouble
1   workers. I mean, it wouldn't take much to really put
2   that area in jeopardy.

Ex. I, 33:11-34:2.

44.    Clark, Plaintiff's supervisor, was instructed to inform his direct reports about the

memorandum when he was able to given their uneven schedules. Ex. I, 35:4-36:4.

45.    All of the BPU's six dispatchers work out of the ESDC. Ex. I, 79:15-20

46.    If two of those six dispatchers had to miss work for COVID-19, the BPU would be

in a position of having to ask its dispatchers to violate its own safety rules and work in excess of

16-hour shifts. Ex. I, 79:25-80:12.

47.    Ash testified:

13    Q.    Okay. Safe to say as COVID was
14  hitting, the BPU could not afford to let its
15  dispatchers -- or a COVID outbreak hit its
16  dispatchers?
17    A.    That's correct. That is the only
18  dispatch center that we have for electric trouble.
19  At midnights and on the weekends we handle the water
20  trouble as well. We were to the point literally
21  where we were discussing what if there is an outbreak
22  in there, is it better for us to try to get some RVs,
23  campers, that kind of thing and quarantine everybody

24   on site and let them work as they feel healthy enough
25   to do so and swap out as they can.· I mean, that's
1    literally to the point of what we were discussing
2    which why the memo was created and the need was there
3    to protect the environment.
4        Q.      And as we talked about bringing on
5    like RVs and campers, safe to say that's something
6    BPU had never considered before?
7        A.      Never considered before. We actually
8    purchased washers and dryers in the event people were
9    stuck there. We actually got a hold of American Red
10   Cross and had tons of cots brought in in the event
11   people would have to be quarantined where they're at.
12       Q.      So safety procedures and restrictions
13   that were being put into effect in March of 2020 were
14   unprecedented?
15       A.      Correct.

Ex. I, 80:13-81:15.

48.     BPU General Manager William Johnson testified that in the early days of the

pandemic, he issued a number of memorandums that progressively stepped up COVID-19

protections, including shutting down the lobbies that customers could walk into, barring all visitors

unless they had a business reason to be on the premises, masking and distancing requirements,

staggering work schedules, and determining who could work from home. Exhibit K, Deposition

of William Johnson, 94:16-95:23.

**Violation of COVID-19 Limited Access Rule**

49.     Plaintiff was disciplined a seventh time approximately 62 days after his sixth

disciplinary infraction, on March 19, 2020. Ex. A, 161:12-19; Ex. H.

50.     The explanation of circumstances on this conduct memorandum reads: "On March

18, 2020 Mr. Johnell Walton entered the ESDC facility with children, thereby violating the limited

access protocol which was instituted to provide additional safeguarding of employees brought

about by the COVID-19 outbreak." Ex. H.

51.    On a day off, Plaintiff was driving with his grandchildren and asked them if they would like to see where he worked. Ex. A, 162:25-163:7.

52.    When he brought in his grandchildren, four other BPU employees were in the facility. Ex. A, 164:7-13.

53.    Plaintiff was disciplined for violations of Rule 7, insubordination, and Rule 39, allowing unauthorized personnel to access restricted areas on BPU premises. Ex. A, 165:20-166:2; Ex. H.

54.    Plaintiff testified:

    2    Q.    And you, as a troubleman, could enter
    3    that, right?
    4    A.    I don't know.
    5    Q.    Okay.
    6    A.    I technically wasn't on shift, so I'm
    7    probably not supposed to be there either.

Ex. A, 169:2-7.

55.    Plaintiff did not talk to Clark, Fergus or Ash about bringing his grandchildren into the facility. Ex. A, 169:8-21.

56.    Plaintiff testified:

    22    Q.    Do you recall when the first time you
    23    saw this memo was?
    24    A.    I don't recall the exact date.
    25    Q.    Was it before or after you came in
    1    with your grandchildren?
    2    A.    Before.
    3    Q.    You had seen this before you came in
    4    with your grandchildren?
    5    A.    Yes.
    6    Q.    Do you agree that you violated this
    7    memo?
    8    A.    Yes

Ex. A, 170:22-171:8.

57.    The door to the ESDC facility, which had the memorandum posted on the exterior, was closed when Plaintiff arrived with his grandchildren. Ex. A, 171:24-172:12; Ex. J.

58.    Plaintiff called another BPU employee on the phone while in the facility, and that employee told Plaintiff that he was not supposed to be in the building. Ex. A, 179:6-180:1.

59.    Plaintiff then gathered his grandchildren and left. Ex. A, 179:6-180:1.

60.    While leaving, Clark called Plaintiff and told him to leave. Ex. A, 179:6-180:1.

61.    Ash, Clark, and Fergus talked and confirmed that Plaintiff had indeed entered the facility with his grandchildren. Ex. I, 71:9-17.

62.    Ash, Clark, and Fergus felt that Plaintiff's conduct was serious enough to generate a conduct memorandum and send it to HR. Ex. I, 71:9-24.

63.    Clark, for whom Plaintiff served as a groomsman in his wedding, wrote the conduct memorandum. Ex. I, 71:25-72:2; Ex. H; Ex. A, 96:8-14.

64.    Ash felt that Plaintiff's conduct "was a straight clear violation of an operating instruction." Ex. I, 82:18-24.

65.    Ash testified:

25    Q.    When you got this back with these
1   violations and recommendation of discharge, were you
2   surprised?
3       A.    No, not so much.
4       Q.    And why not?
5       A.    Again, I believe it was a blatant
6   disregard for operating procedure and just -- you
7   know, I guess that would be the only reason. It was
8   just a flat not doing -- not acting in a way you were
9   supposed to be acting.
10      Q.    And when you say blatant disregard,
11  are you making the assumption that he had read and
12  understood your memorandum?
13      A.    I don't assume that he did or didn't
14  do anything. John wasn't the best employee. I can
15  tell you you couldn't walk in and out of that

16  facility without seeing him at least three or four or
17  five times coming or going.

Ex. I, 75:25-76:17.

66.     Plaintiff was issued the conduct memorandum for this incident in a meeting

attended by his union representative, and a member of the BPU's HR department. Ex. A, 173:14-

174:3.

67.     Plaintiff was given the conduct memorandum and had a chance to read it. Ex. A,

174:8-13.

68.     During the meeting, Plaintiff said he never read the memo:

12      Q.      Why don't you walk me through how that
13   meeting went?
14      A.      I intimated to them that despite them
15   posting the memo, I never stopped to actually read
16   what the memo said. The first time I remember seeing
17   the memo, I walked in the door as usual, hit the time
18   clock. I walked out to the dispatch room and Julie
19   Green was there and she told me John, they just
20   finished fumigating this place, so if you start
21   feeling nauseous, queasy, a little lightheaded, it's
22   probably from the chemical treatment the building
23   just underwent, and I said okay, and when she told me
24   this, I connected the memo on the door that I had
25   bypassed to the information that she just gave me. I
1    incorrectly assumed that that was the -- that memo on
2    the door was the warning about the fumigation.

Ex. A, 178:12-179:2.

69.     If Plaintiff's Union grieves the BPU's actions, including a termination, to an

arbitration, the BPU has the burden of proving just cause for its actions by clear and convincing

evidence.  Ex. K, 138:1-23.

70.     Plaintiff asked that his union arbitrate the termination but his Union told him, "we

don't think we can win so we're choosing not to arbitrate this one." Ex. A, 182:9-22.

71.    Plaintiff testified:

> 15    Was their decision to go straight to D [Termination]
> 16  and do discharge for this based on race?
> 17    A.    I think so.
> 18    Q.    Had they given you level A [Warning], would that
> 19  have been based on race?
> 20    A.    No.

Ex. A, 189:15-20.

72.    Plaintiff later clarified, "[t]he fact that I was disciplined I don't think was racially

motivated. They had a memo, and I did break the rule on the memo." Ex. A, 190:9-21.

73.    About the fact that he was on probation, Plaintiff testified:

> 8    Q.    Yeah. Let me ask it a better way.
> 9   Was you being on probation a factor in the severity
> 10  of your discipline for violating the COVID rule?
> 11    MR. BRAUD:· Calls for speculation.
> 12    A.    I would have to guess what was in
> 13  their mind to answer that question.
> 14  BY MR. LOW:
> 15    Q.    To your understanding, is being on
> 16  probation a factor in increasing discipline for a
> 17  rule violation?
> 18    A.    If it's the same rule, I guess I could
> 19  see that. If I am breaking rule No. 1 and then I
> 20  break rule No. 1 again, it should escalate, and then
> 21  I break rule No. 1 again, it should continue to
> 22  escalate.
> 23    Q.    So if you break rule No. 19, you were
> 24  on probation, that probation only applies to
> 25  violating rule 19 again?
> 1    A.    That's the only way I could see where
> 2  that -- where the question you asked matters or fits.
> 3    Q.    Okay.
> 4    A.    I don't see any other way where it
> 5  could. If I broke the rule of showing up late and
> 6  then I broke the rule of bringing up my grand kids,
> 7  those seem like two separate things.· How does one
> 8  play off of the other?
> 9    Q.    Okay. So probation for violating one
> 10  rule should not effect a violation of a different
> 11  rule?

```
12   A.      Not if you're going to escalate the
13   penalty.
```

Ex. A, 191:8-192:13.

74.     Because Plaintiff was on probation from his January 17, 2020 discipline, the BPU

handbook provides that the discipline imposed for his March 19, 2020 conduct memorandum was

to be stepped up one level in severity. Ex. L, Deposition of Dennis Dumovich, 80:2-7.

75.     Dumovich testified: "we were in the beginning of a COVID-19 epidemic and it was

– people were dying … So, yes, we took to heart these issues because it was a very serious thing

and we didn't know the damage that Mr. Walton was going to do by bringing his grandkids into"

the ESDC facility. Exhibit L, Deposition of Dennis Dumovich, 61:20-62:9.

76.     Dumovich considered circumstances such as the seriousness of the COVID-19

pandemic, the fact that bringing family members into the ESDC had been an acceptable practice

prior to COVID-19, Ex. L 89:14-91:5.

77.     Only the General Manager, William Johnson, has the authority to terminate an

employee. Ex. L, 19:21-20:4; Ex. K, 45:6-13; Exhibit M, Deposition Exhibit 2, p. BPU000076.

78.     Johnson has always been the final decisionmaker for terminations in his tenure as

General Manager of the BPU. Ex. K, 45:14-18, 46:10-13.

79.     Johnson has never delegated the authority to terminate an employee to someone

else. Ex. K, 46:19-21.

80.     Johnson participated in the investigation into Plaintiff's violation of the limited

access memorandum:

```
6   Q.      Okay. Did you participate in any
7   investigation into Mr. Walton's conduct that led to
8   his termination?
9   A.      Did I participate?
10   Q.      Yes, sir.
```

```
11    A.      Yes, I did.
12    Q.      All right. What degree of
13  participation did you have?
14    A.      The evidence was presented to me, I
15  asked a series of questions. I don't remember all
16  the questions. There's some dated material. Once I
17  was convinced that the termination was warranted I
18  said okay.
```

Ex. K, 105:6-18.

81.   Johnson does not simply accept or rubber stamp recommendations from HR. Ex. L, 100:17-22.

82.   HR Director Dennis Dumovich does not make the final determination related to terminations. Ex. L, 100:23-25.

83.   Johnson testified that he has decided not to follow recommendations from human resources in the past. Ex. K, 125:18-21.

84.   Plaintiff has never seen or heard of Johnson acting in a discriminatory way or acting with any racial animus. Ex. A, 36:24-37:14.

85.   Plaintiff has never seen or heard of his supervisor Eric Clark acting in a discriminatory way or acting with any racial animus. Ex. A, 37:15-38:10.

86.   Only one other employee has been found to have violated the BPU's COVID-19, a white male who was disciplined for violating Rule 26 (safety violation) after not wearing his mask. Exhibit N, Defendant's Responses to Plaintiff's First Interrogatories; Exhibit O, Conduct Memorandum.

**BPU Policies**

87.   The BPU employee handbook contains a section discussing discipline and providing rules along with discipline for violations of each rule. Ex. A, 39:11-17; Ex. M, p. BPU00076-80.

88.     The handbook sets out four levels penalties for the various rule violations:

    A.     First Warning and 90 day probation
    B.     Second Warning and 180 day probation
    C.     One week layoff and one year probation
    D.     Discharge

Ex. M, p. BPU000077.

89.     The handbook states, "If an employee is on probation and commits a rule violation of any kind, the penalty imposed for the second rule violation will be the next highest penalty than would have been imposed otherwise." Ex. M, p. BPU000077.

90.     Rule 7 is a single word: "Insubordination." Ex. M, p. BPU000077.

91.     The penalties for violating Rule 7 are a C level for the first offense and a D level for the second offense. Ex. M, p. BPU000077.

92.     Plaintiff does not think he was insubordinate in violating the limited access memorandum, testifying "I don't understand how they can say I was insubordinate when my understanding of that word is willful disobedience." Ex. A, 188:22-189:10.

93.     Plaintiff continued, "[h]ow could I disobey a rule that I did not know was in place." Ex. A, 188:22-189:10.

94.     Johnson testified that insubordination is defined as "fail[ing] to do as instructed." Ex. K, 98:15-16.

95.     Johnson further testified:

    23    Q.      No, I'm not asking you what Johnell
    24  was aware of or not.· I'm simply asking --
    25    A.      I will say --
    1     Q.      -- is a level, is insubordination,
    2   failure to do as instructed, dependent on knowing
    3   what the instruction is?
    4     A.      I would say, yes, if management is
    5   communicating that in such a way that all employees
    6   have access and should know about it, yes. Okay. If

> 7  an employee refuses to acknowledge certain things
> 8  that management is wanting to communicate that's up
> 9  to them. That's their problem, not the company's.

Ex. K, 98:23-99:9.

96.    Johnson further testified:

> 16    Q.    Mr. Johnson, do you believe that
> 17  before there can be insubordination the employee must
> 18  acknowledge the direction given to him?
> 19    A.    No, I do not believe that.

Ex. K, 102:16-19.

97.    Dumovich testified:

> 19    Q.    And if his testimony is that he
> 20  recognizes they were up and he just chose not to read
> 21  them, does that mean that his actions were not
> 22  insubordination because he made the choice not to
> 23  read a directive or to ignore a directive?
> 24    A.    No. He ignored a directive.
> 25    Q.    Okay. So an employee ignoring a
> 1  directive doesn't save them from insubordination,
> 2  does it?
> 3    A.    No.
> 4    Q.    Okay. And I think that's a double
> 5  negative, so is that correct, my question?
> 6    A.    You're correct.

Ex. L. 94:19-95:6.

98.    Defendant opted out of state statutes regarding boards of public utility by charter ordinance under its Home Rule authority. Exhibit O, Charter Ordinance No. CO-5-01.

99.    Section 14 of Charter Ordinance CO-5-01 provides that the Board of Public Utilities shall appoint a General Manger, who shall have charge of all employees. Ex. O.

100.    Section 14(4) provides that the General Manager "[s]hall be primarily responsible for directing, coordinating and executing programs, policies, and decision of the board." Ex. O.

## II.   ISSUES PRESENTED

1.   Whether Defendant should prevail on Plaintiff's claim of race discrimination under §1981?

    a.   Can Plaintiff establish municipal liability against defendant under §1981?

    b.   Can Plaintiff state a prima facie case of race discrimination?

    c.   Does Defendant have non-discriminatory reasons for its actions?

## III.   ARGUMENTS AND AUTHORITIES

### A.  Standard of Review

"The very purpose of summary judgment is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  "The moving party bears the burden to show the absence of a genuine issue of material fact." *Bennet v. Henderson*, 15 F.Supp.2d 1097, 1103 (D. Kan. 1998).  Once the moving party has satisfied its burden, "the burden shifts to the nonmoving party who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  Id. (quoting *Anderson*, 477 U.S. at 256).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  Id.  Here, there is no significant probative evidence tending to support Plaintiff's claims in this case, and summary judgment should therefore be entered in favor of Defendant.

The same substantive standards apply to §1981 claims as to Title VII claims. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1170 (10th Cir. 2018).   The Tenth Circuit applies the *McDonnell Douglas* framework to claims of discrimination or retaliation under both Title VII and §1981. *Mann v. XPO Logistics Freight, Inc.*, 819 Fed.Appx 585, 594 (10th Cir. 2020).   Without any direct evidence of discrimination, the *McDonnell Douglas* framework consists of a three-part test:

> First, the plaintiff must make out a prima facie case.   Second, if the plaintiff makes out a prima facie case, the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its actions.   If the employer does so, the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext.

*Id.* at 595 (internal citations and quotations omitted).   Here, there is no direct evidence of discrimination.

## B.  Municipal Liability Under 42 U.S.C. § 1981.

Because Defendant is a municipality, it cannot be held vicariously liable for its employees' actions unless there is an official policy or custom. *Mitchell v City and County of Denver*, 112 Fed.Appx 662, 671 (10th Cir. 2004).   Plaintiff must demonstrate that discrimination was caused by a custom or policy within the meaning of *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). *Randle v. City of Aurora*, 69 F.3d 441, 446, n.6 (10th Cir. 1995).   Indeed, the Tenth Circuit has held that to establish municipal liability, a plaintiff must show: "1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

Where there is no allegation of an official written policy of racism, Plaintiff must show that Defendant terminated him in accordance with a custom of discriminatory employment practices. *Mitchell*, 112 Fed. Appx. at 672.   A custom is a "persistent and widespread" practice which

"constitutes the standard operating procedure of the local governmental entity." *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989)).  A custom may also be a series of decisions by a subordinate official of which the supervisor "must have been aware." *Id.*  However, "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130 (1988) (plurality).

In *Oklahoma City v. Tuttle,* 471 U.S., 808, 822–824 (1985), a plurality of the Court held that "[t]here must at the very least be an affirmative link between the municipal's policy and the particular constitutional violation alleged."  Here, Plaintiff has not stated what policy is at issue, and thus he cannot and has not attempted to show "an affirmative link" between the policy and his alleged constitutional violation.

The Supreme Court has stated that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question" *Pembaur v. City of Cincinnati*, 475 U.S. 489, 481-82 (1986).  The determination of who constitutes the final policymaker is a legal issue based on state and local law. *Praprotnik* 458 U.S. at 124.

Defendant opted out of state statutes regarding boards of public utility by charter ordinance under its Home Rule authority.  Charter Ordinance No. CO-5-01. DSOF ¶ 98. Section 14 of Charter Ordinance CO-5-01 provides that the Board of Public Utilities shall appoint a General Manger, who shall have charge of all employees. DSOF ¶ 99.  Specifically, 14(4) provides that the General Manager "[s]hall be primarily responsible for directing, coordinating and executing programs, policies, and decision of the board." DSOF ¶ 100.  Further, the BPU's Handbook specifies that the

general manager is the final decisionmaker for terminations, and Johnson has never delegated that authority to another person. DSOF ¶¶ 77-78.  Plaintiff cannot show any policy or practice of discrimination by Johnson, and has testified that he has never observed any racial discrimination or harassment by Johnson. DSOF ¶ 84.

Plaintiff cannot maintain an action under §1981 because his termination is not related to any policy or practice of discrimination.

### C.  Prima Facie Case of Race Discrimination

If Plaintiff can maintain an action against Defendant under § 1981, the first inquiry is whether Plaintiff has stated a prima facie case of race discrimination.  The purpose behind the prima facie requirement established in *McDonnell Douglas* is to obligate a plaintiff to "eliminate [ ] the most common nondiscriminatory reasons for the plaintiff's rejection." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253-54 (1981).

A prima facie case of race discrimination under §1981 requires Plaintiff to establish that: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3), he is qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class. *Braxton v. Nortek Air Sols., LLC*, 769 Fed. App'x. 600, 603 (10th Cir. 2019). Defendant concedes that Plaintiff has established the first three prongs for the purpose of summary judgment.  However, Plaintiff cannot establish that he was treated less favorably than others outside his protected class.

Plaintiff was terminated for violating a limited access directive that was issued in response to the COVID-19 pandemic. DSOF ¶¶ 33, 40.  The only other COVID-19-related discipline was an employee disciplined for not wearing a mask, which was found to be a violation of Rule 26 (violation of a safety rule) of the BPU Employee Handbook. DSOF ¶ 86.  The safety rule violation

regarding masking was not a violation of a specific directive, like Plaintiff's violation of Ash's memorandum was.

Whether or not some discipline was appropriate in this case is not at issue.  Plaintiff does not contest that he violated the limited access memorandum. DSOF ¶ 56.  Plaintiff does not feel like the fact that he was disciplined was based on his race, but rather claims that the penalty imposed  - termination – was discriminatory. DSOF ¶¶ 71-72.  Indeed, Plaintiff testified, "[t]he fact that I was disciplined I don't think was racially motivated.  They had a memo, and I did bread the rule on the memo." DSOF ¶ 72.  Plaintiff feels that a lower level of discipline would not have been based on race. DSOF ¶ 71.  Thus, Plaintiff is left with the sole argument that the level of his discipline constitutes discrimination.

As it relates to severity of discipline, Plaintiff does not even have unsubstantiated testimony to support this position that the severity of his discipline was discriminatory.  The BPU Handbook sets out a penalty for insubordination, and provides that an employee on probation is given a penalty one step higher than what would otherwise be imposed. DSOF ¶¶ 89-91.  The BPU followed its written policy here:  Plaintiff was on probation at the time he was found to have violated Rule 7 due to his previous discipline, and his discipline was increased one level from C (one week layoff and one year probation) to D (discharge). DSOF ¶¶ 74, 88.  Plaintiff cannot point to any disparity in the penalty imposed for either Rule 7 or for employees on probation at the time of discipline.

Lastly, Plaintiff cannot provide any argument based the application of Rule 7 itself. Plaintiff testified that he does not believe he was insubordinate because he was not willfully disobedient. DSOF ¶ 92.  Notably, Rule 7 proscribes insubordination, not willful disobedience. DSOF ¶ 90.  Plaintiff's attempt to excuse his misconduct based on his own interpretation of the

BPU's rules does not allow him to state a *prima facie* case of race discrimination, nor does it show a policy or practice by the BPU's decisionmakers.

Plaintiff cannot show that other similarly situated non-minority employees have been treated differently than himself.   Therefore, Plaintiff cannot establish a *prima facie* case of discrimination.

### D.  Non-Discriminatory Reasons for Defendant's Actions

If the Court finds that Plaintiff has established a *prima facie* case of discrimination, Defendant has the burden of demonstrating non-discriminatory reasons for the employment decisions about which Plaintiff now complains.  Defendant's non-discriminatory reasons include Plaintiff's admission that he violated the COVID-19 limited access directive, that the directive was clearly posted well before Plaintiff violated it, that Plaintiff chose not to read the directive, and that Plaintiff's recent discipline meant he was on probation when he violated the directive, resulting in an upward deviation in discipline pursuant to the BPU's disciplinary policy.

In March of 2020, COVID-19 was in its infancy as a global pandemic.  As the provider of electric and water utility services for Wyandotte County, the BPU was constantly monitoring the situation and began restricting access to its vital functions, including the very dispatchers that sent troublemen like Plaintiff out to jobs.  The BPU was not in a position to withstand a COVID-19 outbreak among its limited numbers of dispatchers or linemen, and went so far as planning to locate certain critical employees live in RV campers at its facilities to minimize their exposure to COVID-19. DSOF ¶¶ 43-47.  One clear way to minimize COVID-19 exposure for dispatchers was to limit who can enter their facility, and Ash implemented his limited access directive to achieve that result.[1]   The directive restricted access only to those BPU employees that needed it:

---

[1] This District, through Amended Administrative Order 2020-2, noted that "one of the most effective ways to protect against the spread of this virus is to limit exposure…" Accordingly, then-Chief Judge Robinson limited on March 16,

supervisors of that unit, the troublemen, the dispatchers, and the janitorial staff. DSOF ¶ 35.  Any other employee outside those groups was required to ask permission to enter the ESDC facility, and non-employees were strictly barred from access. DSOF ¶¶ 36-37.  The memorandum threatened discipline for violations, giving the directive clear teeth. DSOF ¶ 38.  Ash issued the memorandum to the superintendents beneath them, including Plaintiff's superintendent Clark, and directed superintendents to make their direct reports aware of the memo. DSOF ¶ 44.  The memo was also placed prominently throughout the ESDC facility – a troubleman such as Plaintiff would see it twice on the door to enter the building and again by the time clock. DSOF ¶ 42.

Plaintiff has acknowledged that the memo was posted before he brought children into the facility and that he simply did not read it. DSOF ¶ 62.  Plaintiff testified that even though he was a troubleman, he probably should not have even been in the facility that day because he was not on shift. DSOF ¶ 54.  Plaintiff had to open the closed door to the ESDC facility to enter – the same door upon which the memo was posted twice. DSOF ¶¶ 42, 57.  Clark, Plaintiff's supervisor and the man who had asked Plaintiff to be a groomsman in his wedding, initiated the discipline of Plaintiff. DSOF ¶ 63.  When given the discipline, Plaintiff told the BPU that he had seen the memo but not read it, and instead thought it was related to fumigation of the building. DSOF ¶ 68.  Plaintiff's own union felt that an arbitration would not be successful. DSOF ¶ 76.  This is notable because at an arbitration the burden of proof lies on the BPU and the standard is clear and convincing evidence rather than preponderance of the evidence. DSOF ¶ 69. For Plaintiff's Union to feel that it could not overturn his termination, even with the high standards imposed on an employer, is telling.

---

2020 who should enter the courthouse, instructing that people who have an elevated risk of transmitting COVID-19 "shall not enter" the courthouse. Administrative Order 2020-3, issued on March 13, 2020 (the same day as Ash's memo), postponed all pending nonemergency criminal hearings.  The decision to restrict access to facilities was not limited to the BPU.

Plaintiff testified that a lower level of discipline would not have been discriminatory. DSOF ¶ 71.  Thus, the issue here is the level of penalty applied.  As a preliminary matter, it cannot be controverted that Plaintiff was on probation due to his previous discipline in March 2020 and that an employee on probation receives elevated discipline. DSOF ¶ 74.  Because Rule 7, insubordination, has a first-time offense penalty of C-level, Plaintiff's lone remaining argument is that he did not violate the rule against insubordination.

The BPU's Handbook does not provide a definition for every term it contains, so Plaintiff has taken it upon himself to retroactively apply his own definition of "willful disobedience" to Rule 7.  Plaintiff does not have the authority to interpret the BPU Handbook on his own.  BPU employees were directed not to allow non-employees into the ESDC, and Plaintiff acknowledges that he violated this directive.  Ignorance of a rule does not save an employee from discipline. DSOF ¶¶ 107.  By Plaintiff's logic, any potential employee can avoid being disciplined for insubordination by simply stating that they did not hear/see, or chose not to read a directive from a supervisor.  While Plaintiff's lengthy disciplinary history did not result in an upward deviation in his discipline (outside the January 2020 discipline that placed Plaintiff on probation), it does show that he has consistently violated the BPU's rules, and he cannot identify any similarly situated employees who were on probation at the time of similar discipline.

## IV.   CONCLUSION

For all the reasons stated above, Defendant respectfully requests that the Court enter summary judgment in its favor and against Plaintiff, as well as any and all other such relief as the Court deems fair and just.

Respectfully submitted,

/s/ *Spencer A. Low*

Ryan B. Denk #18868
Spencer A. Low          #27690
McAnany, Van Cleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
Telephone: (913) 371-3838
Fax: (913) 371-4722
*rdenk@mvplaw.com*
*slow@mvplaw.com*

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that on the 27th day of January, 2023, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

Bert S. Braud
The Popham Law Firm, P.C.
712 Broadway, Suite 100
Kansas City, Missouri 64105
bbraud@pophamlaw.com

*Attorneys for Plaintiff*

/s/ *Spencer A. Low*