**IN THE US DISTRICT COURT FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| JOHNELL WALTON, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) Case No: 2:21-cv-02532-JWB-ADM |
| | ) |
| UNIFIED GOVERNMENT OF WYANDOTTE | ) |
| COUNTY/KANSAS CITY, KANSAS | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Ralph Andrew refused to follow a direct order regarding COVID protocols at the BPU ***at
least*** four times, and was charged with a "safety violation" and got a warning.  Tracy Blackwell,
after being exposed to COVID-19 by his wife, refused to follow a direct order not to report to
work.  He was not disciplined at all.  Another employee flaunted the BPU's social distance
COVID protocols by deliberating hugging co-workers to express his disdain for the protocols.
He, too, was not disciplined.  All three refused to follow orders they ***knew*** about.

Johnell Walton inadvertently walked into a room with his grandchildren, but the second
he learned he was not supposed to have them there, he left immediately.  He ***did not know*** about
the directive.  He was fired.

The first three are Caucasian.  Walton is African American.  This is a classic case of
disparate treatment.

On Defendant's Motion for Summary Judgment, the Court must accept all of Plaintiff's
evidence as true, including Walton's testimony that he was not aware of the COVID directive.
But ***even if*** Walton was aware of the directive, the dramatic difference in penalties between the
three Caucasian employees and Walton preclude summary judgment in this case.  Genuine issues

1

of material fact exist that makes summary judgment impossible.  Defendant's Motion for

Summary Judgment should be denied.

### Plaintiff's Statement of Uncontroverted Material Facts

This Court is required to view the evidence and draw reasonable inferences in the light

most favorable to Plaintiff Walton.  When there is a conflict in the facts, or facts are capable of

more than one interpretation, the Court must accept Plaintiff's version.

### Plaintiff's Statement of Uncontroverted Facts

**Plaintiff was singled out for discipline**

1.      According to fellow troubleman lineman Sterling Owens, Walton was held to a

different standard than everyone else.  The only employees who get in trouble for "shoddy work"

are minorities.  Ex. A, Declaration of Owens, ¶ 8.

2.      Other employees saw it and warned Walton.  On more than one occasion, he was

advised to seek legal counsel because of the treatment.  Ex. B, Walton depo., p. 18:7-21.  They

told him he was "singled out" and held to a higher standard than anyone else.  "[E]ven the

slightest misstep or infraction on my part was elevated to a higher level than other employees

who had perhaps made similar or the same missteps."  Ex. B, Walton depo., p. 18:25-19:7.

3.      The first week Walton was at the BPU, his supervisor told him that the

supervisor's boss complained about Walton's body language. Ex. B, Walton depo., p. 193-4-16.

4.      In Walton's experience at the BPU, "[s]ystematically, routinely, people of color

there received far greater punishments for similar crimes – what I'm referring to as crimes –

compared to their white counterparts."  Ex. B, Walton depo., p. 189:22-190:8.  See, e.g.,

Plaintiff's response to DOSF ¶ 26.[1]

---

[1] Plaintiff's Statement of Facts are abbreviated PSOF; Defendant's are DSOF.

**Plaintiff was the target of false accusations of sexual harassment and other misconduct**

5.      Walton was accused of "sexual harassment" for making a remark about a fellow male employee (which he denies).  Ex. 5. He was also accused of being responsible for "fellow workers that were injured" because of Walton's "shoddy work."  Ex. 6, p. BPU343.  William Johnson, General Manager at the BPU, believed such an allegation should have been investigated, and he would have wanted to know about it.  Ex. C, Johnson depo., p. 74:24-75:18. Ash was not aware of any such circumstance, and added, "I wouldn't make that allegation unless I knew."  Ex. D, Ash depo., p.50:18-25.

6.      Walton was also accused of being responsible for two fatalities.  Ex. 6, p. BPU345.  One of the fatalities occurred when a person walked into a power line that was down due to a storm.  There was no link to Walton.  Ex. C, Johnson depo., p. 76:23-77:12.

Making that false allegation was a violation of BPU policy.  Ex. C, Johnson depo., p. 77:17-25.  The allegations were not investigated.  Ex. C, Johnson depo., p. 90:24-91:2.

7.      The person making the allegations regarding the fatalities was Danny Bledsoe. Ex. 6, p. BPU343.  Bledsoe "routinely referred to Latin people as beaners and tacos.  He routinely referred to Asians as jap fucks and nips.  He routinely referred to Native Americans as blanket bandits, and he didn't do it subtly.  He blatantly said it in front of everyone all the time." The only racial epithet Bledsoe did not use – in front of Walton – was the "N" word.  Ex. B, Walton depo., p. 99:21-100:11.

8.      Another employee alleged that Walton had received "poor performance reviews." Ex. 6, p. BPU343.  First, Walton did not receive poor performance reviews.  Ex. C, Johnson depo., p. 80:11-23. The only evaluations he received would have been during his probationary period.  Ex. D, Ash depo., p. 21:13-16. Second, the person making the allegation should not have

had access to Walton's reviews and it would have been inappropriate for someone to share them with anyone.  Ex. C, Johnson depo., p. 78:5-13; 88:19-89:7; Ex. D, Ash depo., p. 66:19-23.

9.      Another employee alleged that Walton "trashed" his truck.  Ex. 6, p. BPU345. That was not investigated.  Ex. C, Johnson depo., p. 87:19-24.

10.     Another allegation was that Walton had "stolen time" from time tickets.  Ex. 6, p. BPU345.  That was not investigated.  Ex. C, Johnson depo., p. 88:11-18.

11.     Altogether, had the allegations been true, Walton would possibly have been fired. Ex. C, Johnson depo., p. 92:15-21.

12.     Every person who made the false allegations were Caucasian.  Ex. D, Ash depo., p. 40:16-41:8.

**The Caucasian employees who made the false accusations were not investigated, much less disciplined**

13.     The accusations against Walton, if substantiated, were serious enough to warrant discipline.  Ex. C, Johnson depo., p. 67:11-15; p. 73:12-23.  Johnson believed the allegations "would have caused me to ask more questions, you know, and try to dig into what's going on." Ex. C, Johnson depo., p. 73:24-74:13.  He would have wanted to investigate the allegations.  Ex. C, Johnson depo., p. 74:14-20.

14.     The BPU's policies allow for the discipline of an employee who makes false accusations.  Ex. 2, BPU policy; Ex. E, Dumovich depo., p. 16:2-5; Ex. C, Johnson depo., p. 25:5-12 and 67:6-10.  "Q. And would you read [the policy] to mean that if someone made a false accusation about an employee or something an employee had done that would be a violation of the BPU's policy?  A. Yes."  Ex. C, Johnson depo., p. 25:13-17.

15.     Robert Manthei's allegation that Walton made an inappropriate comment to the fire chief could have been verified by interviewing the Kansas City Fire Chief, an employee of

4

the Unified Government.  Ex. C, Johnson depo., p. 68:10-23.  Had the Chief said that Walton did

not make the comment in question, Manthei should have been disciplined.  Ex. C, Johnson depo.,

p. 69:20-70:1.

16.     The allegations against Walton were serious enough to have warranted discipline

had they been true.  Ex. C, Johnson depo., p. 84:4-10.

17.     No action was taken against those that made the false accusations.  Ex. C,

Johnson depo., p. 67:1-5.

18.     Other than the allegation of sexual harassment, Walton was never informed of any

of the other allegations until this litigation.  Ex. B, Walton depo., p. 93:4-11; 104:4-22; 222:9-

223:3.  In spite of the seriousness of the allegations, they were never investigated and Walton

was never asked about them.  Ex. B, Walton depo., p. 223:4-224:4.

19.     Even though HR recommended Walton be terminated (Ex. 6, p. BPU346), no one

ever told Walton he had even been the target of the complaints.  Ex. B, Walton depo., p. 106:13-

22.

**Plaintiff did not knowingly disobey a directive, and was not insubordinate**

20.     When a directive was posted on the door of the ESDC restricting entry, Dennis

Dumovich, Director of HR, assumed there had been supervisor meetings at which the directive

was discussed.  Ex. E, Dumovich depo., p. 60:9-16.  Clark was supposed to have held a meeting

with his subordinates.  Ex. D, Ash depo., p. 35:4-12; 26:5-12. Ash "assumed Mr. Clark had

talked to all of his staff is what I assumed.  That's what he was assigned to do."  Ex. D, Ash

depo., p. 69:4-9.

21.     But, there were no group meetings for the troubleman linemen concerning COVID regulations, and the linemen were never notified by any supervisor of rule changes.  Ex. A, Declaration of Owens, ¶ 13.

**Plaintiff did not read the memo**

22.     When Walton first saw the memo on the door, he walked into dispatch, and was told that the building had just been fumigated, and if he felt lightheaded or nauseous, that was the reason.  He associated the memo on the door with the fumigation.  Ex. B, Walton depo., p. 178:12-179:2; 224:19-225:3.

23.     According to Owens, there "is always something posted" on the front door or other places, but no one reads the posts.  Ex. A, Declaration of Owens, ¶ 12.

**No one told Plaintiff he was not supposed to be there, and he left immediately upon learning of the directive**

24.     When Walton walked into the building with his grandchildren, three people were in the room.  Walton said "hello" to them.  Ex. B, Walton depo., p. 164:7-24.  They exchanged greetings, but no one told Walton his grandchildren were not supposed to be there.  Ex. B, Walton depo., p. 165:6-19; 226:4-14.

25.     One of his grandchildren asked to see a co-worker she had met previously. Walton called the co-worker to ask him if he could come over.  The co-worker said, "John, we're not allowed in your building"; "they just told us today."  At that point Walton realized the memo on the door must have been about that directive.  He hung up with the co-worker and told his grandchildren they needed to leave.  As he was leaving, his supervisor called him and told him he needed to leave, and Walton replied, "We're leaving now."  Ex. B, Walton depo., p. 179:6-180:1.

26.     When Walton was terminated, he tried to explain the circumstances, but was not permitted to do so.  Ex. B, Walton depo., p. 174:18-175:3.

**Insubordination requires knowledge**

27.     There is no definition of "insubordination" at the BPU.  Ex. C, Johnson depo., p. 153:16-23. Dumovich agreed that before an employee could be insubordinate in not following an order, the employee has to be aware of the order.  Ex. E, Dumovich depo., p. 71:10-16.  "Q. In order to be insubordinate you have to be aware of the order that you're violating?  A. Yes."  Ex. E, Dumovich depo., p. 71:18-22.

28.     Dumovich also agreed that it is not insubordination to do something you do not know is wrong.  Ex. E, Dumovich depo., p. 72:1-4.  To be insubordinate, "[t]hey have to knowingly violate" an order.  Ex. E, Dumovich depo., p. 72:18-25.  "They have to knowingly violate a policy."  Ex. E, Dumovich depo., p. 76:18-77:8.

29.     Jeremy Ash, a supervisor, agreed that before someone could be insubordinate, they first have to be aware of the direction:  "Yes. I believe if somebody knows something should be A and they go ahead and do B, that's disregard for the operating instruction."  Ex. D, Ash depo., p. 73:9-15.  The employee has to "knowingly disregard" the instruction.  Ex. D, Ash depo., p. 73:17-74:3.

30.     With regard to the false allegations, Johnson believed that it must be proven the employee *intentionally* made false allegations.  Ex. C, Johnson depo., p. 145:1-10.

31.     Walton did not intentionally disregard the memo, and would have followed the directive if he knew about it.  Ex. B, Walton depo., p. 225:16-22.

**Defendant failed to follow its policy regarding discipline**

32.     The written policy of the BPU is that, "When an employee violates a rule and a formal reprimand is necessary, the supervisor should: Have a discussion, as soon as practical, with the employee involved, explain the infraction and inform the employee that disciplinary action is forthcoming."  Ex. 2, Employee Handbook, at. P. BPU076.  Johnson expects that to happen first.  Ex. C, Johnson depo., p. 46:20-23.

33.     Johnson also expects that "HR ***fully understands what took place*** and that is included in their recommendation." Ex. C, Johnson depo., p. 48:25-49:5, emphasis added.

34.     It was "routine" for shift workers like Walton to bring guests into the building.  "Sterling brought his kid up.  Jeremy brought his kid up.  John has brought his kid up, his wife up.  Kelly brought her grand kids and daughter up.  Frank has brought his kids up."  Ex. B, Walton depo., p. 228:9-21.  "Everyone would bring in family members to the ESDC."  Ex. A, Declaration of Owens, ¶ 14.

35.     Dumovich heard that other employees had brought family members to the same area.  Ex. E, Dumovich depo., p. 82:6-8.  Ash knew of that happening.  Ex. D, Ash depo., p. 69:10-13; 75:21-24.

36.     HR makes the recommendation on whether an employee is to be terminated or not.  Ex. E, Dumovich depo., p. 20:5-13.  HR is solely responsible for deciding what rule has been violated (Ex. D, Ash depo., p. 35:11-15) and any penalty.  Ex. C, Johnson depo., p. 47:24-48:4.  The appropriate infraction is determined by HR based on the content of the "narrative" portion of the conduct memorandum.  Ex. D, Ash depo., p. 27:13-19; see, e.g., Ex. 12.

37.     Johnson is the only person at the BPU with the authority to discharge an employee.  Ex. 2, BPU Employee Handbook at BPU076; Ex. C, Johnson depo., p. 45:6-13.

Johnson would make any decision "based upon the circumstances presented."  Ex. 2, Employee Handbook, p. BPU077; Ex. C, Johnson depo., p. 49:11-17.  Johnson has always followed Dumovich's recommendations.  Ex. E, Dumovich depo., p. 30:21-23; Ex. C, Johnson depo., p. 128:17-23.

38.     Dumovich's practice is to consult with the department "well in advance of issuing [] discipline."  Ex. E, Dumovich depo., p. 21:2-14.

39.     The magnitude of the possible discipline to be taken could potentially be considered in determining whether more investigation is necessary.  Ex. E, Dumovich depo., p. 23:18-25.

40.     HR has the authority to recommend a decreased penalty "if mitigating circumstances exist."  Ex. 2, Employee Handbook, p. BPU076; Ex. C, Johnson depo., p. 49:6-10. It is Dumovich's responsibility to determine whether mitigating circumstances exist.  Ex. E, Dumovich depo., p. 25:7-13.

41.     Johnson was not presented with any mitigating circumstances, such as the fact that Walton had not read the directive, was not told by anyone present that he needed to leave, and that he left immediately upon learning of the directive.  Ex. C, Johnson depo., p. 129:20-130:3.

42.     Dumovich has never met Walton, much less interviewed him.  Ex. E, Dumovich depo., p. 31:6-11.  No one from HR talked to Walton before making the recommendation.  Ex. E, Dumovich depo., p. 43:6-13; p. 45:10-20.  Nothing prevented Dumovich from calling Walton. Ex. E, Dumovich depo., p. 64:23-25.

43.     Dumovich made the recommendation to terminate Walton without having all the facts.  Ex. E, Dumovich depo., p. 66:11-18.

44.     For his part, Johnson, who made the decision to terminate Walton, never talked to Walton, and was not aware that Walton had not actually read the directive.  Ex. C, Johnson depo., p. 103:12-15; 103:22-104:2; 105:19-22; 106:11-16.  Johnson made the decision before he learned that Walton had not read the directive – "I just learned about it from you" – at his deposition.  Ex. C, Johnson depo., p. 117:16-22; 120:10-17.

45.     Johnson also did not know that no one told Walton he was not supposed to have his grandchildren there (Ex. C, Johnson depo., p. 118:14-23) or that Walton left immediately upon learning of the directive -- "I was not aware of that."  Ex. C, Johnson depo., p.  118:6-12.

46.     The "universe" of all information Johnson had on the matter came from HR, who also never talked to Walton.  Ex. C, Johnson depo., p. 106:22-107:6; 124:1-125:3.

47.     According to Johnson, Dumovich presented him with "written documents."  Ex. C, Johnson depo., p. 108:10-18.  Dumovich "went through his investigative report line by line, section by section."  Ex. C, Johnson depo., p. 108:23-109:2.  The investigative report had to have been something different that the conduct memorandum, because Dumovich never gave him the conduct memorandum.  Ex. C, Johnson depo., p. 111:12-19.  No investigative report was produced in discovery.

48.     The policy allowed Dumovich to make a recommendation of discipline short of termination.  Ex. E, Dumovich depo., p. 80:8-12.

49.     Previous disciplinary actions were supposed to "drop off" after the period of the penalty runs.  Ex. D, Ash depo., p. 89:21-90:13.  Nevertheless, in Walton's case, they were considered – the children on the property "was the final straw in the long line of disciplinary actions."  Ex. E, Dumovich depo., p. 62:14-17.

**A Caucasian employee was insubordinate and was not disciplined**

50.     Tracy Blackwell is a Caucasian.  Ex. D, Ash depo., p. 91:4-5.  During that same time period, Blackwell called in and told his supervisor he had been exposed to COVID, and was told not to enter the building.  He disobeyed that directive but was not terminated.  Ex. B, Walton depo., p. 184:24-185:5; 186:18-22; Ex. A, Declaration of Owens, ¶ 15.  "Blackwell refused to follow those instructions and came to work anyway, hanging out in the breakroom."  Owens believes Blackwell infected him.  *Id.*

51.     If Blackwell came to work after testing positive for COVID, he would have violated the same directive for which Walton was terminated.  Ex. D, Ash depo., p. 91:1-3.

**Statistics**

52.     Jevon Ledbetter and Anthony Garner, both African Americans, were involuntarily dismissed from the apprentice program.  Ex. C, Johnson depo., p. 34:20-35:5.

53.     There are 35 linemen at the BPU.  Ex. C, Johnson depo., p. 32:10-18.  Of those not in management, i.e., actually working as linemen, Sterling Owens is the only African American lineman.  *Id.*, 33:22-34:7.

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**</u>

Plaintiff makes the following responses to Defendant's Statement of Facts which Plaintiff controverts:

**Plaintiff's Prior Discipline**

4.     Plaintiff testified about this rule violation:

```
6    Q.    Was this a fair discipline?
7    A.    It's the rule.
8    Q.    Did you think it was unfair that you
9  were disciplined for these six tardies or failed
10  punches?
11   A.    It's the rule.
```

```
12      Q.      Do you think the rule is fair?
13      A.      I didn't -- I don't feel like it's my
14  place to say whether it's fair or not. I do think
15  that the fact that you forget to clock out can be
16  looked at as unfair, but even if it is unfair, it is
17  the rule, and as long as they follow it unilaterally,
18  that kind of makes it fair because it applies to
19  everyone equally.
```

Ex. A, 48:6-19.

RESPONSE:   Uncontroverted, but defendant fails to include Plaintiff's additional

testimony that he did not have any knowledge whether the rule was applied uniformly. Ex. B,

Walton Depo., at 49:4-25.

9.      The explanation of circumstances for this discipline was a customer complaint,

specifically that Plaintiff had informed a BPU customer to cut down telephone and cable lines

from a pole to get a quicker response from those utilities. Ex. A, 108:3-12; Ex. D.

RESPONSE:   **Controverted**. Plaintiff never informed the 80-year-old female customer

to climb up a pole to cut down telephone and cable lines from a pole to get quicker response

from other utilities. Ex. B, Walton Depo., at 109:6-9; Ex. F, Walton Declaration, ¶2.

14.     The explanation of circumstances provides:

> While investigating a claim submitted to the Utility on January 8,
> 2016, it was discovered that Johnell Walton and Greg Rico left an
> unsafe condition when they failed to detect/troubleshoot secondary
> voltage on the neutral conductor of the customer's service line
> after responding to a Fire Call/Arcing Wire in Meter Can at
> [redacted]  Dec. 21, 2015. Johnell Walton confirmed that he did
> not check voltage at the meter can which would have detected
> voltage on the customer's neutral. Greg Rico stated that he arrived
> late to the call and confirmed that Johnell Walton worked the Fire
> Call.
> Later that morning, Sterling Owens was dispatched to [redacted]
> and found an energized secondary conductor in direct contact with
> the neutral conductor on the customer's service line. Once he
> cleared up this condition, it removed voltage from the customer's
> neutral and ground at the house making it safe.

Ex. E.

RESPONSE:   **Controverted**. Plaintiff believed there was no defect caused by BPU, and any defect was caused by the cable television service. Ex. F, Walton Declaration, at ¶3. It was determined that the tree branches caused the system neutral line to split in two, causing the neutral line to become hot with electricity. *Id*. Additionally, the cable company had attached their wire to the ground wire. Ex. B, Walton Depo., at 117:18:118:1. This caused the voltage to travel to the cable box. Ex. A, Owens Declaration, at ¶4.

15.    The basis of this discipline was Plaintiff not checking the voltage on a meter can, which can cause a fire. Ex. A, 116:20-24.

RESPONSE:   **Controverted**. Plaintiff did not check the voltage of the meter can because the fire department informed him that, after opening the breaker, the fire went out, which meant the issue was somewhere inside the home. Ex. B, Walton Depo., at 116:25-118:1. Sterling Owens, another troubleman, would have done the exact same thing Plaintiff did had he been told the same thing by the fire department. Ex. A, Owens Declaration at ¶5.

20.    The misconduct for which Plaintiff was terminated was a violation of Rules 21 and 26 and Section 8.013 of the Employee Handbook for having his driver's license suspended three times between February 22, 2014 and September 30, 2015, driving a company vehicle during this time, and not informing the BPU about the suspensions. Exhibit F, Deposition Exhibit 9, p. BPU000111-12.

RESPONSE:   **Controverted.** Plaintiff was not aware his license had been suspended. Ex. B, Walton Depo., at 130:23-132:2. When Defendant informed Plaintiff that he should have a Kansas license (to also verify residency), Plaintiff immediately obtained a valid Kansas driver's license. *Id*.

22.     The arbitrator however concluded that the BPU failed to follow its rules on driver's licenses by not maintaining records on Plaintiff's driving record on a periodic basis and thus should have known of the suspensions sooner. Ex. F, p. BPU000116.

RESPONSE:   Uncontroverted, but the Arbitrator added, "In this case, management did not follow its own standards set forth in Section 7.021 and therefore the Company is also at fault for the situation surrounding the Grievant's misconduct." Ex. 9, Arbitrator's Award, at BPU000117.

26.     The explanation of circumstances on this conduct memorandum reads:

> On January 17, 2020 Johnell Walton left an unsafe condition at the intersection of Park Drive and 19th Street, when he left a downed span guy on the ground which could have become energized. In addition, he left an unsafe condition across the street, when he failed to clear up downed electrical lines and equipment on the sidewalk next to a commercial customer. I was informed by Antonio Marin of the problem and we met with Johnell Walton for him to clear up the downed wires and make both locations safe.

Ex. G.

RESPONSE:   **Controverted**. Steve Lanue (Caucasian) was first assigned the call at Park Drive and 19th Street because Plaintiff was on another call.  Plaintiff later went to the call to assist Lanue. Ex. F, Walton Declaration, at ¶5. Plaintiff was the third person to arrive to the scene and saw the pole and wire were across the street on the sidewalk, which was deemed to be the best place for it so the road could be reopened. Ex. B, Walton Depo., at 157:19-158:21. A digger derrick was required to pick up the pole and Plaintiff did not have the capability to transport a pole. Ex. B, Walton Depo., at 157:19-158:21.  Dispatch was notified that a crew with a digger derrick was needed, and Plaintiff and Lanue left the scene after getting the lights back on. Ex. B, Walton Depo., at 158:8-159:1.  Even though it was Lanue's assignment, Lanue was not disciplined for this incident. Ex. B, Walton Depo., at 159:10-11.

28.     The originator of this conduct memorandum was Eric Clark, Plaintiff's supervisor, and Plaintiff agreed that the "I" referenced in the conduct memorandum was likely Clark because he remembers going to the scene with Clark and Tony Marin. Ex. A, 155:11-20.

RESPONSE:   **Controverted**. Clark and Marin only required Plaintiff to go up the pole and cut down the span guy that was hanging down – they did not require Plaintiff to clean up the wire left on the sidewalk. Ex. B, Walton Depo., at 160:8-22; 161:1-8.

30.     Plaintiff does not believe that he grieved this discipline. Ex. A, 155:25-156:1.

RESPONSE:   It is uncontroverted that Plaintiff did not grieve this discipline, but additional context is necessary to understand why. Plaintiff's Union representative told Plaintiff that he could fight the discipline to get it dropped to a step 1 discipline. Ex. F, Walton Declaration, at ¶5. Plaintiff said to not worry about grieving the discipline because he felt defeated because they were coming at him, and that he would deal with the next one when it comes because it was going to happen anyway. Id.

32.     Plaintiff was disciplined a seventh time approximately 62 days later, on March 19, 2020 for violating a COVID-19 limited access directive. Ex. A, 161:12-19; Exhibit H, Deposition Exhibit 12.

RESPONSE:   **Controverted**. The incident took place on March 18, 2020, but Plaintiff was not presented with the discipline until April 6, 2020.  Ex. 12, at BPU000088.

**COVID-19 Limited Access Rule**

44.     Clark, Plaintiff's supervisor, was instructed to inform his direct reports about the memorandum when he was able to given their uneven schedules. Ex. I, 35:4-36:4.

RESPONSE:   **Controverted**. Clark was given the instruction "to make a meeting anytime somebody is coming and going." Ex. D, Ash Depo., at 36:5-9. Ash did not know if that instruction was carried out by Clark. Ex. D, Ash Depo., at 36:10-12.

49.     Plaintiff was disciplined a seventh time approximately 62 days after his sixth disciplinary infraction, on March 19, 2020. Ex. A, 161:12-19; Ex. H.

RESPONSE:   **Controverted**. See Plaintiff's Response to DSOP ¶ 32.

55.     Plaintiff did not talk to Clark, Fergus or Ash about bringing his grandchildren into the facility. Ex. A, 169:8-21.

RESPONSE:   **Controverted**. Plaintiff had no knowledge of what the memorandum said, so he did not know he was required to get permission from Clark, Fergus, or Ash about bringing his grandchildren into the facility. Ex. F, Walton Declaration, at ¶6.

56.     Plaintiff testified:

```
22    Q.     Do you recall when the first time you
23 saw this memo was?
24    A.     I don't recall the exact date.
25    Q.     Was it before or after you came in
1  with your grandchildren?
2     A.     Before.
3     Q.     You had seen this before you came in
4  with your grandchildren?
5     A.     Yes.
6     Q.     Do you agree that you violated this
7  memo?
8     A.     Yes
```

Ex. A, 170:22-171:8.

RESPONSE:   **Controverted**. While Plaintiff may have seen the memo, he had not read the memo and assumed it had to do with the recent fumigation of the ESDC. Ex. B, Walton Depo., at 224:16-225:3. If Plaintiff had read the memorandum, he would have obeyed it. Ex. B, Walton Depo., at 225:16-22.

68.     During the meeting, Plaintiff said he never read the memo:

        12    Q.      Why don't you walk me through how that
        13  meeting went?
        14    A.      I intimated to them that despite them
        15  posting the memo, I never stopped to actually read
        16  what the memo said. The first time I remember seeing
        17  the memo, I walked in the door as usual, hit the time
        18  clock. I walked out to the dispatch room and Julie
        19  Green was there and she told me John, they just
        20  finished fumigating this place, so if you start
        21  feeling nauseous, queasy, a little lightheaded, it's
        22  probably from the chemical treatment the building
        23  just underwent, and I said okay, and when she told me
        24  this, I connected the memo on the door that I had
        25  bypassed to the information that she just gave me. I
        1   incorrectly assumed that that was the -- that memo on
        2   the door was the warning about the fumigation.

Ex. A, 178:12-179:2.

        RESPONSE:   **Controverted**. The cited testimony by the Defendant was what Plaintiff

attempted to explain during his grievance proceeding, which was after his termination. During

his initial termination meeting with Ash, Rico (Union representative), and Ashley Culp (HR),

Plaintiff was not allowed to explain why it was a mistake, being told "you will have your chance

to state your case at the grievance." Ex. B, Walton Depo., at 174:16-23.

71.     Plaintiff testified:

        15     Was their decision to go straight to D [Termination]
        16  and do discharge for this based on race?
        17    A.      I think so.
        18    Q.      Had they given you level A [Warning], would that
        19  have been based on race?
        20    A.      No.

Ex. A, 189:15-20.

        RESPONSE:   **Controverted as incomplete**:

        You don't give someone a little pat on the wrist when, you know,
        for something and say – the reason that they took it this far was

> racially motivated. Systemically, routinely, people of color there
> received far greater punishments for similar crimes – what I'm
> referring to as crimes – compared to their white counterparts. It
> routinely and regularly happens. There is very little to suggest to
> me that the color of my skin did not play a part in the severity of
> my punishment, because it routinely happens that way at that
> company.

Ex. B, Walton Depo., at 189:22-190:8.

72.     Plaintiff later clarified, "[t]he fact that I was disciplined I don't think was racially

motivated. They had a memo, and I did break the rule on the memo." Ex. A, 190:9-21.

RESPONSE:   **Controverted**. Plaintiff did not clarify anything. The full testimony,

including the question:

> Q.      Okay. So the severity of discipline was based on race, but
> the fact that you were disciplined itself was not rationally
> motivated? Or is it the fact that you were disciplined and the
> severity, both were racially motivated?
> A.      No. The fact that I was disciplined I don't think was
> racially motivated. They had a memo, and I did break the rule on
> that memo. I ignorantly broke it. I did not insubordinately break it.
> I ignorantly broke it, so they had a just reason to say this needs to
> be disciplined. My race just upped the ante to where now we get to
> go all out on it. I believe that that is relevant.

Ex. B, Walton Depo., at 190:9-21.

74.     Because Plaintiff was on probation from his January 17, 2020 discipline, the BPU

handbook provides that the discipline imposed for his March 19, 2020 conduct memorandum

was to be stepped up one level in severity. Ex. L, Deposition of Dennis Dumovich, 80:2-7.

RESPONSE:   **Controverted**. The cited testimony does not state that the conduct

memorandum was to be stepped up one level in severity – only that insubordination by itself is

recommended for a C-level discipline, but that he was on probation from the January incident.

Dumovich agreed that the discipline was elevated to a D-level discipline (for termination), but

that Dumovich had the opportunity to make the D recommendation or could say because of the

facts, the discipline should not be a D. Ex. E, Dumovich Depo., at 80:2-12. When asked if but for

the January situation, Dumovich would have recommended the C-level discipline, Dumovich

responded, "I don't know. I'd have to go back and rethink." Ex. E, Dumovich Depo., at 80:16-

24.

      80.    Johnson participated in the investigation into Plaintiff's violation of the limited

access memorandum:

> 6    Q.    Okay. Did you participate in any
> 7  investigation into Mr. Walton's conduct that led to
> 8  his termination?
> 9    A.    Did I participate?
> 10   Q.    Yes, sir.
> 11   A.    Yes, I did.
> 12   Q.    All right. What degree of
> 13  participation did you have?
> 14   A.    The evidence was presented to me, I
> 15  asked a series of questions. I don't remember all
> 16  the questions. There's some dated material. Once I
> 17  was convinced that the termination was warranted I
> 18  said okay.

Ex. K, 105:6-18.

      RESPONSE:  **Controverted**. Johnson did not interview Plaintiff, and his decision was

"based on all the evidence that [his] trained professional HR department had gathered and

presented to [him]." He only met with Dumovich, Dumovich's supervisor, Lori Austin (who had

nothing to do with the investigation), and the attorneys. Ex. C, Johnson Depo., at 105:24-107:22.

      83.    Johnson testified that he has decided not to follow recommendations from human

resources in the past. Ex. K, 125:18-21.

      RESPONSE:  **Controverted**. The line of questioning cited by the Defendant concerned

whether Johnson "ever not followed the recommendation made to you by HR regarding

termination." Ex. C, Johnson Depo., at 125:18-20. After talking about a recommendation

regarding termination of Sterling Owens for a residency violation (Johnson was not sure if it was at the point of recommending termination), Johnson was asked again if he could "think of any instance where HR made an unequivocal recommendation of termination and you refused to follow that recommendation," and Johnson answered, "I cannot." Ex. C, Johnson Depo., at 128:17-23.

86.     Only one other employee has been found to have violated the BPU's COVID-19, a white male who was disciplined for violating Rule 26 (safety violation) after not wearing his mask. Exhibit N, Defendant's Responses to Plaintiff's First Interrogatories; Exhibit O, Conduct Memorandum.

RESPONSE:   **Controverted**. Tracy Blackwell did not follow directives of not entering the building after having a Covid exposure. Ex. B, Walton Depo., at 184:19-185:5. Another unidentified employee intentionally violated social distancing protocol and hugged people because the employee believed Covid was a hoax. Ex. B, Walton Depo., at 187:1-17.

## ARGUMENTS AND AUTHORITIES

### A.  Standard of Review

Summary judgment is appropriate only if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." *Trinidad v. Agiliti Health, Inc.*, 19-2683-DDC, 2022 WL 343678, at *6 (D. Kan. Feb. 4, 2022); Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Id.*, citing *Scott v. Harris*, 550 U.S. 372, 378 (2007). "An issue of "material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Id.*, citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.* When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, citing *Anderson*, 477 U.S. at 249.

"In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. " *Owens v. Unified Government of Wyandotte Cnty./Kansas City, Kansas*, 2022 WL 2131117, at *1 (D.Kan.2022)

When considering summary judgment under Fed.R.Civ.P. 56, the Court must review the facts ***in the light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from the facts.*** *Adicks v. S.H. Kress & Co.,* 399 U.S. 144 (1970). Summary judgement is only appropriate when "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Denver Post Corp.,* 203 F.3d 748, 751 (10th Cir. 2000) (internal citations omitted) (evidence viewed and all inferences drawn in the light most favorable to party opposing summary judgment).

In *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), the Supreme Court reinforced the admonition that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgement." The Court stated: "The witnesses on both sides come to this case with

their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence . . . the court below neglected to adhere to the fundamental principle that at the summary judgment stage, ***reasonable inferences should be drawn in favor of the nonmoving party***." *Id*. at 1867-68, emphasis added.

B.  **Defendant is liable under § 1981.**

Defendant's argument is based on *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978) and its progeny.  The case was discussed and explained in *Pembaur v. City of Cincinnati*, 475 U.S. 489, 480 (1986); the issue was whether a plaintiff could prove a municipal policy or custom by a single act. The answer was in the affirmative.

> The "official policy" requirement [of *Monell*] was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.  *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.
>
> With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.

*Pembaur*, 475 U.S. at 479–80, emphasis in the original.  Even a single decision unquestionably constitutes an act of official government policy.  *Id.* at 480, citing *Owen v. City of Independence,* 445 U.S. 622 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); *Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981) (City Council canceled license permitting concert because of dispute over content of performance).

It is clear that Plaintiff is not required to show a custom or policy.  Such a requirement would be illogical on its face.  Essentially, Defendant's argument is that, before the BPU can be liable

for racial discrimination, it must have a ***policy to discriminate.***  Of course, then, there is no

"official written policy of racism."

Defendant's illogical argument attempts to stretch the caselaw to an unreasonable end,

suggesting that before it can be liable for discrimination, there must be a *pattern* of

discrimination.  Not so – as *Pembaur* held, a single act of discrimination is sufficient to impose

liability.

### C.  **Plaintiff makes a prima face case**

Conceding the first three elements of the prima facie case,[2] Defendant relies solely on

Plaintiff's alleged misconduct in violating the limited access directive as a "non-discriminatory

reason" for his termination.  Judge Lungstrum, of this District, noted that in such a case, Plaintiff

is not required to disprove defendant's proffered reasons, particularly in establishing a prima

facie case:

> Significantly, defendant also relies on plaintiff's asserted poor job
> performance as the reason for its adverse employment decisions.
> This court, relying on established Tenth Circuit precedent, has
> repeatedly declined to analyze an employer's assessment of the
> plaintiff's performance at the prima facie stage where the employer
> (like defendant here) also asserts that the plaintiff's alleged
> deficient performance was the employer's legitimate,
> nondiscriminatory reason for taking the adverse employment
> action. *See Goldstein v. Sprint/United Management Co.,* 2006 WL
> 2631948, at *7 (D.Kan. Sept.13, 2006) (collecting cases and
> relying on *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d
> 1184, 1192–94 (10th Cir.2000) and *Bullington v. United Air Lines,
> Inc.,* 186 F.3d 1301, 1316 n. 11 (10th Cir.1999)). The court, then,
> will not require plaintiff, as part of her prima facie case, to
> disprove defendant's proffered reasons for making the adverse
> employment decisions at issue.

*Day v. Kraft Foods North America, Inc.*, 490 F.Supp.2d 1148, 1154–55 (D.Kan.,2007).

---

[2] Plaintiff is a member of a protected class (African American), he suffered adverse job action (he was terminated),
and he was qualified for the position.

Defendant argues that, because Plaintiff cannot show he was treated less favorably that non-minority employees, he cannot show the fourth element.  But, the *Day* case also addresses this aspect of the *prima facie* case:

> Defendant also argues that plaintiff's failure to identify any similarly situated non-minority employees who were treated more favorably is "fatal" to her claims. The Tenth Circuit, however, has expressly held that a plaintiff is not required to come forward with evidence of similarly situated employees to establish a prima facie case.  *See Horizon/CMS Healthcare Corp.,* 220 F.3d at 1195 n. 6 ("Nothing in the case law in this circuit requires a plaintiff to compare herself to similarly situated co-workers to satisfy the fourth element of her prima facie case."). The court, then, summarily rejects this argument.

*Day*, 490 F.Supp.2d 1148 at 1155.

Even though he is not so required, Plaintiff can show multiple instances of non-minorities treated more favorably.  Defendant admits that a Caucasian employee received a dramatically less harsh penalty for violating a directive that required the wearing of masks while indoors.  The conduct memorandum notes that the employee "has received company emails and verbal warnings issued by his direct and indirect supervisors regarding the mandatory requirement to wear masks in public indoor areas."  Defendant dismisses the infraction as a "safety rule violation", which it somehow asserts in not a "specific directive."  The language in the conduct memorandum is clear.  First, the employee was warned ***multiple times***.  He received not only company emails (*plural*), but was also issued verbal warnings (*plural*).  He received, then, ***at least*** two emails directing him in writing to wear a mask indoors, and ***at least*** two verbal warnings – he was told to his face!  And, the directives came from *multiple sources* – both his direct and indirect supervisors.  In other words, several people told him several times to follow a "mandatory requirement" -- a directive -- and he disobeyed that directive.  How is that ***not***

insubordination?  Yet, he was only given a warning and probation.  For violating several direct orders, he did not lose a dime of wages, much less his job.

A "Rule 26 violation of a safety rule" has four levels of penalty, with the lowest being a "First warning and 90 day probation" (Ex. 2, p. BPU077-79).  A "Rule 7" violation for insubordination, however, starts immediately at a level C, one week layoff and one year probation; level D is discharge.  Was there disparate treatment, i.e., was Plaintiff treated worse than a non-minority?  The non-minority violated direct orders on multiple occasions, but given a "safety rule" violation.  Plaintiff unintentionally violated a directive ***once***, and was charged with insubordination.  Defendant cannot square the two.

In addition, Tracy Blackwell was insubordinate in refusing to follow a directive not to come inside the building, after he tested positive for COVID-19.  He was not even disciplined with the low-level warning and probation – no discipline at all.  PSFO ¶¶ 50-51.

Defendant makes much of the horrific circumstances of the COVID pandemic to justify its actions against the Plaintiff – and to be sure, the pandemic was a frightening time for everyone.  However, when it comes to the lack of discipline for Andrew and Blackwell, Defendant seems to have forgotten how serious the pandemic was.  It is a disingenuous for Defendant to argue, at DSOF ¶¶ 75-76, that they did not know what damage Walton had done by bringing his grandchildren to work, but then ignore the damage done by others who willfully refused to follow COVID protocol.

Beyond violation of COVID protocols, Plaintiff's evidence is that non-minorities made multiple serious false accusations about Plaintiff, which resulted in a memorandum from HR recommending termination.  Ex. 6.  Even though BPU policy prohibits false allegations about co-workers, the non-minorities were not even investigated, much less disciplined.  See, PSOF ¶ 17.

The evidence viewed in the light most favorable to Plaintiff shows he was treated less favorably than non-minorities.

D. **Defendant's "Non-Discriminatory Reasons" are a pretext for discrimination.**

While Defendant may advance its non-discriminatory reasons for its actions, Plaintiff shows those reasons are merely a pretext for the real, discriminatory reasons. To show that an employer's proffered non-discriminatory reason for an employment action is pretextual, "a plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Day*, 490 F.Supp.2d at 1157–58, quoting *EEOC v. BCI Coca–Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir.2006). "[E]vidence of pretext may include the following: 'prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria.'" *Owens*, 2022 WL 2131117, at *10 (D.Kan., 2022), citing *Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999).

*"Prior treatment of plaintiff"*

The treatment of Walton by the BPU shows a pattern of unfair and disparate treatment. Defendant showed its discriminatory animus towards Walton from day one. Early in his tenure at the BPU, Walton was criticized for his "body language." PSOF ¶ 3. It was apparent to other linemen like Sterling Owens that Walton had been singled out. PSOF ¶ 2.

In 2015, Walton was the target of serious but unfounded accusations – accusations that, if true, could have gotten him fired. Among other things, he was accused sexual harassment,

trashing a co-worker's truck, making rude and inappropriate comments to customers and firemen, stealing time and cheating another employee out of overtime. He was even accused of causing injury and death. PSOF ¶¶ 5-19. In every instance, the accusations were made by Caucasian co-workers. PSOF ¶ 12. If substantiated, the accusations should have resulted in disciplinary action and even termination; in fact, HR actually recommended termination. Ex. 6. The fact that **no disciplinary action** was taken against Walton demonstrates that the accusations were untrue. Yet, none of the Caucasian accusers were even investigated, much less disciplined. PSOF ¶ 17.

In 2016, Walton was terminated over an issue with his driver's license. Walton was not aware that his license had been suspended, and immediately obtained a Kansas license. Plaintiff's Responses to DSOF ¶¶ 20-22. The fact that he was able to obtain a Kansas license indicates his license was not suspended. Walton was reinstated following a grievance, and the arbitrator concluded that the BPU failed to follow its own standards. Response to DSOF ¶ 22.

In 2020, Walton was disciplined for supposedly mishandling an "unsafe condition." Walton was the **third** BPU employee to respond – it was not his assignment. The person **assigned** to the situation, Caucasian Steve Lanue, was not disciplined. See, Response to DSOF ¶ 26.

### *"Disturbing procedural irregularities"*

As with the termination over the driver's license issue, when the arbitrator ruled that the BPU has not followed its own standards, Defendant did not follow its own rules in terminating Walton.

**Policy Violation No. 1** The written policy of the BPU is that the supervisor should have a discussion "as soon as practical" with the employee involved, and Johnson's expectation is that a

discussion will be had.  PSOF ¶ 32. There were supervisors *on the scene* when Walton showed up in March 2020, but no one had a discussion with him, then or later.  There were supervisors who could have told Walton immediately that he should not have been there with his grandchildren, but instead, they merely exchanged greetings.  PSOF ¶ 24.  Walton's first indication of a problem came from someone he *called*, not someone in the room.  *Id.*

**Policy Violation No. 2** The BPU also violated the policy by failing to learn all the facts before recommending discipline – "shoot first and ask questions later."  General Manager Johnson said that he expects that "HR *fully understands what took place*" before making the recommendation.  PSOF ¶ 33.  But HR Director Dumovich has never met Walton, much less talked to him; *no one* from HR talked to Walton.  PSOF ¶ 42.  As a result, Johnson did not know *fully understand what took place* until his deposition, when he heard the circumstances *for the first time!*  PSOF ¶¶ 44-45.

**Policy Violation No. 3** No mitigating circumstances were presented to Johnson.  The "universe" of all information given to General Manager Johnson came from HR Director Dumovich.  PSOF ¶ 46.  The HR Director may recommend a decreased penalty "if mitigating circumstances exist."  The General Manager then makes the final decision "based upon the circumstances presented."  Ex. 2.  But, Johnson was never presented the mitigating circumstances that (1) multiple employees had, in the past, brought family members to work, (2) Walton had been told the building had been fumigated and assumed the memo on the door was related to that, (3) he had not read the memo, (4) upon entering the building, no one told him he could not have family there or objected to his family being there, (5) upon learning of the directive, he immediately left.  See, PSOF ¶¶ 22-25, 34-35.  None of those mitigating factors were presented to Johnson, in violation of policy.  By comparison, Johnson's excuse for not

investigating the false accusations against Walton was that they would have to prove intent. PSOF ¶ 30.  The "intent" standard was not applied to Walton.

**Policy Violation No. 4** Dumovich and Ash agree that "insubordination" requires that the insubordinate employee have knowledge of a rule or directive they deliberately choose not to follow.  PSOF ¶¶ 27-29.  Ex. 23, from the Society on Human Resources (SHRM)[3] website, speaks to insubordination in the workplace.  One of the three determining factors is that the employee acknowledges the order.  The evidence that this Court must accept as true is that Walton ***did not*** know of the rule or directive, and therefore, while he may have been careless, he could not have been insubordinate.  Indeed, Infraction 26 is for "Violation of a safety rule", with less severe penalties – which brings us to . . .

**Policy Violation No. 5** . . . the BPU inconsistently designated the infractions of those in violation of the COVID protocols.  Ralph Andrew was informed of a ***mandatory*** mask protocol ***four times*** (that we know of).  He received multiple written company emails, and was told to his face at least twice, about the mask requirement.  He was told by both his direct and indirect supervisors.  He was told the requirement was mandatory.  To use Ash's verbiage (see, PSOF ¶ 29), Andrew knew "something should be A and [went] ahead and [did] B."  In the "insubordination" analysis, there can be no question that Andrew was fully aware of the mandate.  Yet, he did not do as instructed.  That is insubordination.

Yet, Andrew was charged with a Rule 26 "Violation of a safety rule" with minimum penalties.  Compare that to the BPU's handling of Walton: One violation, not four; never sent a company email or told directly to his face; left immediately when told after he had entered the building.

---

[3] Dumovich agreed that SHRM was widely recognized as a leader in human resources.  Ex. E, Dumovich depo., p. 10:21-25.

Then there's Tracy Blackwell, who showed up for work and entered the building in direct violation of instructions ***not*** to enter.  And another employee who, apparently thinking COVID was a hoax, flaunted the rules on social distancing and hugging people.   Response to DSOF ¶ 86.  Neither was disciplined.

### Statistical evidence

The strong statistical data also raises an inference of discrimination based on race.  The BPU has a residency requirement whereby its employees must be residents of Wyandotte County.  *Owens v. Unified Government of Wyandotte Cnty./Kansas City, Kansas*, 2022 WL 2131117, at *1 (D.Kan., 2022) ("BPU requires all employees to establish and maintain their "legal primary residence" within the legally defined boundaries of the Unified Government."). Because of that policy, the "pool" of available workers is easily discernable: In Wyandotte County, 67 per cent of residents are Caucasian, and 22 per cent are African American. *Wyandotte County, Kansas Quick Facts*, UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/wyandottecountykansas.

In *Owens,* plaintiff claimed that he was subjected to an unfair and extensive investigation of his residency.  Plaintiff in that case argued that people of color were investigated for residency violations at a rate disproportionate to the demographics of the workforce as a whole.  In denying the BPU's Motion for Summary Judgment, Judge Vratil noted that "out of the 26 people investigated, BPU disproportionately investigated people of color—57 per cent. Specifically, 37 per cent of those investigated are African American, compared to the 22 per cent of Wyandotte County residents that are African American. *See, Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981) (plaintiff's burden establishing disparate treatment prima facie case not onerous)."  *Owens*, 2022 WL 2131117, at *9.

Here, the statistics are even more dramatic.  The BPU currently has 35 linemen.  PSUF ¶ 64. Only *one* – journeyman Sterling Owens – is African American.  The percentage of lineman apprentices that are African American is 0%, and the percentage of all lineman who are African American is less than 3%. Finally, the only two people ever kicked out the program are African American – Anthony Garner and Ledbetter.

## CONCLUSION

Genuine issues of material fact exist that preclude summary judgment.  When the facts are viewed in the light most favorable to the Plaintiff, drawing all reasonable inferences in his favor, it is clear -- Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,

**THE POPHAM LAW FIRM, P.C.**

By: /s/ Bert S. Braud
Bert S. Braud, KS Bar No. 14223
712 Broadway, Suite 100
Kansas City, Missouri  64105
Telephone:    (816) 221-2288
E-Mail:       bbraud@pophamlaw.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

   The undersigned hereby certifies this 24th day of February, 2023 that the above and foregoing was served via ECF filing to:

Ryan B. Denk #18868
Spencer Low, #27690
McAnany, Van Cleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
Telephone (913) 371-3838
Email: rdenk@mvplaw.com
   slow@mvplaw.com

**ATTORNEYS FOR DEFENDANT UNIFIED GOVERNMENT**

       <u>/s/ Bert S. Braud</u>
       Attorney for Plaintiff