IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOHNELL WALTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-cv-02532-JWB-ADM |
| | ) |
| UNIFIED GOVERNMENT OF WYANDOTTE | ) |
| County/Kansas City, Kansas as | ) |
| Representative of | ) |
| Kansas City Board of Public Utilities. | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Defendant"), and provides its Reply in Support of its Motion for Summary Judgment.

**I.    RESPONSES TO PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS**

1. Controverted and immaterial. Plaintiff does not demonstrate how Owens' foundation for evidence about Plaintiff being held to a different standard, nor does either this fact or Owens' declaration state that Plaintiff is treated differently than employees outside his protected class. Further, Plaintiff could not identify how other employees are disciplined differently based on race:

> Q. So is it your position that the BPU disciplined its black linemen more often and more severely than the white linemen?
> A. I would say yes, to that.
> Q. Okay. So we've gone through a couple men. Jeremy Mische, he's white, right?
> A. Yes.
> Q. So he gets written up or disciplined less than black linemen do?
> A. Yes.
> Q. Do you know of any discipline he's been issued?
> A. No.
> Q. What about Rob Manthei?

1

A. I don't know.
Q. What about Bledsoe, is he white?
A. Yeah.
Q. Has he been disciplined, to your knowledge?
A. No.
Q. Greg Rico, what race is he?
A. He's Hispanic.
Q. Has he been disciplined?
A. It would surprise me if he had been. Greg's a straight-and-narrow guy, but I would have to ask him if he's ever gotten written up for anything.
Q. You don't know that he has?
A. Nothing jumps to mind right now.
Q. What about Sterling Owens, he's black, right?
A. Yes.
Q. Has he been disciplined?
A. Yes.
Q. What has he been disciplined for?
A. He has about his time clock, because everybody gets that it seems, but there were – I don't remember any of the specifics. I just remember us talking about -- talking about, Oh, yeah, I got written up for this or I got wrote up for that. There was one instance, something involving a wire that was maybe perhaps left hanging. I don't recall if he -- I remember him telling that someone talked to him about it. I don't remember if he told me that he got wrote up for it. So many years, so many conversations.
Q. What about Bortka, has he ever been disciplined, to your knowledge?
A. Not to my knowledge.
Q. What troublemen am I leaving out that you've worked with?
A. Dan Lennon.
Q. What race is Dan Lennon?
A. Caucasian.
Q. Has he ever been disciplined to your knowledge?
A. Not to my knowledge.
Q. Who else?
A. Steve Lanue.
Q. Has he ever been disciplined?
A. One or twice.
Q. What race is he?
A. Caucasian.
Q. Okay.
A. I'm trying to think of who all I've worked with over there. Worked with Tracy Blackwell, Caucasian.· I don't know if he's ever got written up. Aaron -- I can't think of his last name at the moment. Caucasian. I don't know that he's ever been written up. Jeff Sanders I worked with.
Q. What race is Jeff?
A. Black.

2

        Q.      Has he ever been disciplined?
        A.      If he hasn't, he's the luckiest guy on the planet, but I'm trying to think back if he ever told me about a specific incident, and I can't recall. Jim House, Caucasian, once that -- yeah. Once that I'm aware of. I'm trying to think of anybody that I might be missing, but ten years, so many people –

Exhibit A, Plaintiff's Deposition, 218:12-221:16.

As for Plaintiff's identification of Owens' discipline, this is inaccurate. HR Director Dennis Dumovich is well-versed in Owens' personnel file because Owens recently lost a case of race discrimination against Defendant at trial – at which Dumovich testified. Exhibit B, Dumovich Deposition, 101:1-17. Here, Dumovich testified that Owens has never been disciplined. *Id.* There is no evidence that minority linemen or employees are disciplined more often or differently.

2. Controverted. The first and third sentences are not supported with citations to the record. D.Kan.R. 56.1(b)(1). Statements made to Plaintiff are inadmissible hearsay. *Argo v. Blue Cross & Blue Shielf of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. Pro. 56(c)(2). As for the final sentence, Plaintiff's disciplinary memos speak for themselves as to whether he was disciplined for "the slightest misstep" or was "elevated to a higher level." Plaintiff has admitted he has no knowledge of the discipline of other employees. Ex. A, 218:12-221:16.

3. Controverted and Immaterial. Plaintiff is not alleging harassment, and this hearsay-within-hearsay falls outside the statute of limitations for a discrimination claim under §1981.

4. Controverted. Plaintiff has no knowledge of others' discipline. Ex. A, 218:12-221:

5-12. These paragraphs are immaterial. Plaintiff was not subject to any adverse action from these complaints and was terminated years later for violating a BPU directive. Plaintiff does not state why these are relevant other than being various red herrings.

6. Controverted as to the second paragraph. The cited excerpt was subject to objections to form. The question asked a hypothetical, and Johnson's testimony does not support what Plaintiff

writes. Johnson testified that it would violate policy "if somebody made that statement and if it was proven not to be true."

15. Controverted. Plaintiff again misquotes Johnson, who testified that he did not know. Johnson did not that Manthei "should have been disciplined."

17. Controverted. Plaintiff assumes without factual support that false allegations were made.

27. Controverted. Plaintiff omits objections in his quotes. Dumovich had already been asked and answered this question, testifying "I don't know that the employee has to acknowledge the order." ECF Doc. 42-6, 70:24-71:8.

28. Controverted. Dumovich testified "You have to be aware of -- have seen the directive that was given. And it was pretty clear in writing what that directive was." ECF Doc. 42-6, 14-16.

29. Controverted. The quote says only that when an employee is aware of a rule and does not follow it, that is insubordination. Ash was not purporting, nor was he asked, to provide the sole circumstance giving rise to insubordination. Ash clarified:

> Q.      And, again, and I don't want to parse words with you, but when you say disregard, to me that implies they have to know about the instruction and then willfully disregard it.
>  MR. LOW: Object to form.
> BY MR. BRAUD:
> Q.      Is that what you're saying or something else?
>  MR. LOW: Same objection.
> A.      **No. I'm saying if you know something is a certain way and you choose to do the other way, you knowingly disregarded that.**

ECF Doc. 42-5, 73:17-74:3 (emphasis added).

30. Controverted. Johnson was discussing a separate section of the BPU handbook that incorporates a mental state by pertaining to "intentional false accusations." ECF Doc. 42-8, p. 17.

34. Immaterial. Employees bringing in children prior to COVID-19 and the limited access directive is a red herring and was not against any polices or directives at the time it happened.

4

36. Controverted. HR is not responsible for deciding "any penalty," as only the General Manager has the authority to terminate. DSOF ¶ 77; PSOF ¶ 37.

37. Controverted. *See* DSOF ¶ 81, 83.

41. Controverted. Johnson's testimony only discusses that no mitigating circumstances were provided. There is no cited evidence to support anything after "such as…" D.Kan.R. 56.1(b)(1).

42. Immaterial. Dumovich testified that in over thirty-five years of experience in HR, it is common to not talk to employees before issuing discipline, as BPU does. Ex. B, 9:17-20, 98:12-21. The BPU does not decide whether to talk to employees prior to discipline based on an employee's race. Ex. B, 98:5-11. Talking to employees "is not part of the process" used at the BPU. Ex. B, 46:21-47:3. The BPU's standard policy is to issue discipline *before* talking to the accused employee. Ex. B, 47:5-10.

43. Controverted. Dumovich testified that he considered all pertinent facts. ECF Cod. 42-5, 67:18-21. Plaintiff grossly misrepresents Dumovich's testimony. Defendant requests that the Court compel Plaintiff to produce the video of this deposition, as Dumovich was not responding in the affirmative to the question posed, but instead was explicitly refusing to speculate as Plaintiff's counsel repeatedly asked him to do, subject to multiple objections.

47. Controverted. Plaintiff propounded no discovery that would cover an investigative report. Exhibit C, Responses to Plaintiff's First and Second Requests for Production of Documents.

49. Controverted. Plaintiff's January 2020 discipline was considered in elevating his discipline, but there is no evidence that the prior discipline resulted in an upward deviation – nor could it, as there is no discipline above termination. DSOF ¶ 29, 74, 89.

50. Controverted. Blackwell's statement is hearsay and being offered here for its truth: that he had COVID-19 and said that to his supervisor. The omitted testimony in between Plaintiff's

5

citations contains an admission that Blackwell was not violating the same directive Plaintiff violated. Plaintiff testified that Blackwell violated the same memo Plaintiff did, but the memo does not relate to Blackwell's alleged actions. ECF Doc. 42-2 185:6-186:17. If Blackwell's statements are admissible, he told Superintendent Mike Fergus that he was exposed but had not tested positive and was not symptomatic, which did not violate policy. Exhibit D, Affidavit of Mike Fergus.

53. Controverted and immaterial. The BPU has twenty-eight union linemen. DSOF ¶ 109. Plaintiff's restriction to linemen who have not been promoted in an attempt to cherry-pick facts is not material.

## II. REPLIES TO PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

Plaintiff improperly controverts Defendant's statement of uncontroverted facts by arguing that many are incomplete or that they have a poor implication. A party cannot controvert a fact by simply adding more information or claiming that its implication is incorrect. *Dewitt v. Southwestern Bell Telephone Co.*, 41 F.Supp.3d 1012, 1015 (D. Kan. 2014); *see also*, *In re Wilson*, No. 09-10375, 2011 WL 2215145, at *5 (Bankr. D. Kan. May 27, 2011) ("It is improper to make an additional assertion that does not *specifically* controvert the fact or meet the substance of the fact.") (emphasis original). The following facts are improperly controverted as "incomplete:" 4, 22, 30, 71, and 72. The following facts are improperly controverted in essentially the same way by simply adding "context:" 9, 14, 15, 20, 26, 55, and 56. Additionally, Defendant provides the following responses to Plaintiff's improper attempts to controvert facts.

28. Plaintiff's response appears misplaced, as it does not address any part of DSOF ¶ 28.

30. Besides being improper and not controverting, Plaintiff's response is immaterial. His declaration states that the Union could have grieved it to a lower level of a 90-day probation. Plaintiff's violation of the COVID-19 memo still would have occurred within those 90 days.

44. Plaintiff does not controvert that Clark was instructed to inform direct reports, which is what this fact states. Plaintiff attempts to controvert an unstated fact – whether Clark did so.

55. This is not controverted. What Plaintiff knew is not what the fact states.

56. This is not controverted. The fact is Plaintiff's own testimony, and Plaintiff controverts by simply adding additional information.

68. Defendant agrees Plaintiff said this in a grievance meeting, but what Plaintiff testified is uncontroverted.

72. It is unclear what Plaintiff controverts about his own testimony.

74. Plaintiff's additional citations support the fact that his discipline was increased.

80. Plaintiff confuses "participate" with "interview." Johnson need not interview Plaintiff to have participated in the investigation.

83. Plaintiff controverts a fact not stated. It is uncontroverted that Johnson has chosen not to follow a recommendation from HR. Plaintiff's own statement of facts shows that it was recommended by HR that Plaintiff be terminated in 2015 and that was not followed. PSOF ¶ 19.

86. Plaintiff's second sentence lacks foundation, as he could not provide names or details. Defendant is unaware of this situation. Blackwell did not violate BPU policy because he had not tested positive for COVID-19 and was not symptomatic at the time. Exhibit D, Affidavit of Mike Fergus. Ralph was never directed not to come into the BPU facilities. Ex. D. Additionally, Plaintiff discusses the actual discipline discussed in DSOF ¶ 86 without citation, so Defendant adds that this employee, Andrew Ralph, was disciplined after receiving only company-wide emails

to all BPU employees – Ralph was not specifically told to wear a mask. When Ralph was observed not wearing a mask, Dumovich asked him to put a mask on, which Ralph did and Ralph was not observed violating a safety rule again. Exhibit I, Affidavit of Dennis Dumovich.

### III.   ADDITIONAL STATEMENTS OF FACT

Because Plaintiff relies on the use of statistical demographic data that is misrepresented, Defendant provides the following additional facts regarding the issue. If Plaintiff requires a Sur-Response for the purpose of controverting these facts, Defendant does not object.

101.   Allen Dixon is the Business Representative for IBEW Local No. 53. Exhibit E, Corporate Representative Deposition of IBEW Local No. 53, 5:16-20.

102.   IBEW Local No. 53 serves as the union for the BPU, as well as other linemen and construction workers in the Kansas City area. Ex. E, 5:24-6:25.

103.   IBEW Local No. 53 provided demographic information for linemen in the Kansas City metropolitan area. Ex. E, 10:12-24; Exhibit F, Dixon Deposition Exhibit 2.

104.   IBEW Local No. 53 produced a list of the linemen it represents, which displays 647 names. Ex. F.

105.   Of the 647 linemen, fourteen are African-American. Ex. E, 13:19-25; Ex. F.

106.   Of the 647 linemen, thirty-eight are minorities. Ex. E, 14:8-24; Ex. F.

107.   Of the 647 linemen, 609 are Caucasian. Ex. E, 14:25-15:2; Ex. F.

108.   IBEW Local No. 53 represents twenty-eight linemen at the BPU. Ex. E, 16:22-17:4; Exhibit G, Dixon Deposition Exhibit 3.

109.   Of the twenty-eight linemen at the BPU, six declined to provide their race. Ex. E, 17:10-13; Ex. G.

110. Of the twenty-eight union linemen at the BPU, nineteen are white. Ex. E, 18:18-20; Ex. G.

111. IBEW Local No. 53 also produced demographic data for Independence Power & Light (IPL), another municipal utility. Ex. E, 18:21-19:15; Exhibit I, Dixon Exhibit 4.

112. IBEW Local No. 53 represents thirty linemen at IPL, of whom twenty-four are white and none are African-American. Ex. E, 19:19-20:11.

## IV. ARGUMENT AND AUTHORITIES

### A. Plaintiff Fails to Meaningfully Address Municipal Liability

Plaintiff argues that a single act is sufficient under the *Monell* standard, citing to *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986). Plaintiff's focus on this issue misunderstands this standard. *Monell* requires that "the municipality itself must have generated the 'moving force' behind the alleged constitutional violation, either through official policy or widespread and pervasive custom." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1275 (10th Cir. 2022). Plaintiff argues that only a single action is necessary to establish a constitutional violation, but fails to understand that "[t]here must at the very least be an affirmative link between the municipal's policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle,* 471 U.S., 808, 822–824 (1985) (plurality opinion). Plaintiff's refusal to discuss policy or custom dooms his Response – Plaintiff only argues about the constitutional violation but fails to address the necessary requirement that the violation be caused by a custom or practice.

Plaintiff neither identifies a policy at issue nor shows an "affirmative link" between it and an alleged constitutional violation. Rather, Plaintiff oversimplifies the law and moves on without any substantive discussion about this condition precedent to Defendant's liability. Plaintiff does

9

not state what arguments made by defendant are "illogical" or how Defendant "attempts to stretch the caselaw to an unreasonable end." ECF Doc. 42, p. 23.

### B. Plaintiff Has Not Established A Prima Facie Case

While Plaintiff need not engage in an evaluation of similarly-situated employees, he still must prove that he was treated less favorably than other not in the protected class. *Braxton v. Nortek Air Sols., LLC*, 769 Fed. App'x. 600, 603 (10th Cir. 2019). Plaintiff first points to Andrew Ralph, appearing to reference specific portions of the record without citation to a statement of uncontroverted fact. Ralph's memorandum references the company-wide emails regarding BPU masking policy, which were sent by multiple people multiple times. Reply to Response to DSOF ¶ 86. Plaintiff characterizes Ralph's conduct as violating a direct order, but fails to identify where Ralph was given a direct order. Plaintiff also incorrectly claims that Ralph violated a rule multiple times, which is not supported by the evidence (to the extent Plaintiff refers to any uncited evidence specifically). Blackwell was never directed not to come into a building and did not violate any policies. Reply to Response to DSOF ¶ 86.

As to COVID-19 and the complaints about Plaintiff, those relate to Defendant's non-discriminatory reasons for its actions and are addressed by Defendant below.

### C. Plaintiff Fails to Show Pretext

The importance of COVID-19 to this case is not simply that COVID-19 happened and was "a frightening time." The importance of COVID-19 to this case is that Plaintiff brought children into a critical facility – in violation of a clearly-posted directive – in the very first days of the pandemic, at the same time that the county was shutting down. On March 19, 2020, so little was known about COVID-19 that it was unclear how it spread or what the risk factors for contracting it might be. In the first days of Wyandotte County's shutdown, Plaintiff chose to walk into the

dispatch center – in which the County could not afford a COVID-19 outbreak – with two additional individuals outside the exposure bubble for the dispatchers present. Plaintiff brought visitors into this facility at the worst time to do so, which cannot be overlooked three years and multiple vaccines later.

As to the 2015 complaints about Plaintiff, he fails to show why these time-barred issues are relevant here. Should the court accept them, they do not show pretext. The complaints were made by Plaintiff's coworkers rather than supervisors, were promptly investigated pursuant to BPU policy, and there is no allegation of negligence in controlling working conditions. Thus, liability would be precluded by *Ellerth/Faragher. Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013). Further, those investigations show that even when HR thought termination of Plaintiff was warranted, Johnson did not terminate Plaintiff, nor was Plaintiff even disciplined.

Plaintiff's 2016 termination and reinstatement is not unfair treatment: the arbitrator concluded that Plaintiff's misconduct – proven to the arbitrator through clear and convincing evidence – was significant enough to warrant an eleven-month unpaid suspension. DSOF ¶¶21-24. Nor does plaintiff put any good faith argument into his January 2020 discipline, and his own declaration shows that his Union thought it could lower the discipline but not completely overturn it. ECF Doc. 42-7. ¶ 5. Even with an A-level discipline, Plaintiff still would have been within his ninety-day probation when he violated Ash's limited access directive. *See* DSOF ¶¶ 25, 88.

   *i. Disturbing Procedural Irregularities*

As with the entirety of his argument section, Plaintiff delves into legal issues without discussing the law. Plaintiff rests much of his case on "disturbing procedural irregularities," which to him simply means any decision with which he disagrees. In *Simms v. Okla. Ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999), the Tenth

11

Circuit mentioned "disturbing procedural irregularities" with a parenthetical explanation of "e.g. falsifying or manipulating hiring criteria." *Id.* This factor thus requires some sort of intentional conduct by an employer. Here, Plaintiff makes no claims that conduct memorandums were manipulated – indeed, his attempts to controvert what his disciplinary memos say boils down to arguing about the context of his actions.[1] Plaintiff's interpretation of Tenth Circuit case law renders the word "disturbing" superfluous by contending that anything potentially out of his subjective view of ordinary must constitute pretext. Indeed, the policy violations Plaintiff alleges are neither policy violations nor disturbing procedural irregularities. Plaintiff argues that each policy violation is a "disturbing procedural irregularity" but fails to draw any connection between the alleged policy violations and any "disturbing procedural irregularity." Plaintiff's failure to discuss any legal principals at all beyond mere lip service should be rejected by the Court. An irregularity necessarily requires comparison to the "regular," which Plaintiff declines to discuss.

Plaintiff's first alleged violation makes little sense. There is no evidence that there were "supervisors *on the scene*," and Plaintiff again fails to cite to factual support for a bolded and italicized claim. ECF Doc. 42, p. 28. It is uncontroverted that Plaintiff's supervisor called Plaintiff while Plaintiff was leaving the facility. DSOF ¶ 60. Defendant did have Plaintiff's supervisor talk to Plaintiff as soon as possible.

Plaintiff's second alleged violation is not a policy. Plaintiff claims that Defendant failed to learn all the facts, but points to no policy that Defendant must or should talk to an accused employee prior to issuing discipline. Dumovich testified unequivocally that BPU's policy is not to talk to any employee, regardless of race, prior to issuing discipline. Response to PSOF ¶ 42.

---

[1] Nor does Plaintiff bother to argue about whether his conduct memorandums differ from Caucasian employees'.

Plaintiff's third alleged violation is not a policy. Defendant *can* consider mitigating circumstances, but its policy uses permissive rather than mandatory language (HR "may recommend to the General Manager … to decrease the penalty indicated if mitigating circumstances exist."). ECF Doc. 42-8, p. 77, § 8.013. There is no policy violation in not following permissive language. Plaintiff's misstatement of BPU's policies does not create a policy violation.

Plaintiff's fourth alleged violation is illogical. Plaintiff contends that there is no definition of insubordination, PSOF ¶ 27, and then proceeds to provide his own specific, inadmissible definition from the internet. Notably, even this differs from Plaintiff's testimony that insubordination requires "willful disobedience." DSOF ¶ 92. Johnson testified that refusing to acknowledge management's communication is insubordination and that an employee need not acknowledge a directive to be insubordinate. DSOF ¶ 95-96. Dumovich testified that employees who ignore a directive are not insulated from violating Rule 7 (insubordination). DSOF ¶ 97.

Plaintiff's fifth alleged policy violation ignores actual facts.[2] Andrew Ralph was disciplined for not wearing a mask after a BPU-wide email to all employees discussed masking at work. Reply to Plaintiff's Response to DSOF ¶ 86; Ex. I. Ralph was not told four times, as Plaintiff's invented and unsupported argument claims. Ralph violated a safety rule and was disciplined accordingly. Plaintiff's argument means that any time an employee violates any rule, that employee is doing so insubordinately and must be also disciplined under Rule 7. Such a result is not implicated by the BPU's policies and is not a credible way to interpret the BPU handbook.

Notably, Plaintiff glosses over how prominently the memorandum was posted and his own testimony that he simply chose not to read it. The but-for cause of his rule violation was his own actions in choosing to ignore the memorandum.

---

[2] Plaintiff's inability to correctly state his coworker's name underscores the lacking merit of this argument.

*ii.   Statistical Data*

In his argument about demographic statistics, Plaintiff again fails to provide sufficient legal basis.  Plaintiff's failure to point to applicable legal principals is notable because Tenth Circuit law is skeptical of statistical data, especially when presented without context, as Plaintiff does here. Plaintiff argues without factual citation that the "pool" of available workers is "easily discernable" because of the BPU's residency requirement.  Plaintiff provides zero factual support for his implied requirement that the BPU only hire current residents of Wyandotte County, and cites to another case for factual support in the case at bar.  Indeed, Plaintiff himself was not a resident of Wyandotte County when he was hired by the BPU. *See* Exhibit A, Plaintiff's Deposition, p. 22:18-20.  The residency requirement is a non-sequitur: there is no credible argument that the entire population of Wyandotte County is qualified to be a lineman or to complete the Apprenticeship, while individuals outside the county can still apply to BPU and move into the County.

Plaintiff cites only to Judge Vratil's opinion, which is not controlling precedent. *Garcia v. Tyson Foods, Inc.*, 534 F.3d 1320, 1330 (10th Cir. 2008).  "Statistics taken in isolation are generally not probative of … discrimination." *Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995).  [S]tatistical evidence on its own "will rarely suffice" to show pretext." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 (10th Cir. 2007 (quoting *Ortiz v. Norton,* 254 F.3d 889, 897 (0th[h] Cir. 2001)).  "[A] plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991) (emphasis original).  In *Timmerman*, the Tenth Circuit noted that plaintiffs must "[a]t the very least…" eliminate nondiscriminatory explanations. 483 F.3d at 1115.

Plaintiff's statistical evidence does not establish pretext because it does not take into

14

account nondiscriminatory explanations. *See Foster v. Rurhpumpen, Inc.* 166 Fed. Appx. 389, 392-93 (10th Cir. 2006).³  In *Foster*, a failure to hire case under the ADEA, the Tenth Circuit noted that statistical evidence on the ages of employees hired or not hired was "too simplistic" because it "fail[ed] to take into account individual differences in skill or qualifications and fail[ed] to eliminate nondiscriminatory reasons for any age difference," and therefore it failed to show pretext. *Id.*  Plaintiff's statistics about Wyandotte County fails to consider the experience, qualifications, and training of those individuals. Comparing a group of twenty-eight specialized employees to an entire county fails to show pretext.

Moreover, Plaintiff provides false information about the BPU's demographic makeup of linemen, Response to PSOF ¶ 53, and completely ignores the comparison between the BPU and the region.  Plaintiff's own union provided clear evidence that the BPU's demographic makeup of linemen is at least on par, if not more diverse, than the region. DSOF ¶¶101-12.  While the 647 regional linemen are 2.2 percent African-American, the twenty-eight union linemen at the BPU 3.6 percent African-American. DSOF ¶¶ 104-07.  Independence Power & Light, a similarly sized municipal utility company, has no African-American linemen. DSOF ¶¶111-12.

Lastly, Plaintiff includes a throwaway sentence that has no bearing here about two individuals removed from the BPU's Apprenticeship program.  Those individuals were removed from the Apprenticeship (training) program, and summary judgment has already been granted to Defendant for Garner's removal for failure to show a *prima facie* case of discrimination. *Garner, Jr. v. Unified Gov't of Wyandotte Cty./Kansas City, Kan.*, No. 21-cv-02154-EFM, 2022 WL

---

³ Failure to account for non-discriminatory explanations is often cited by the Tenth Circuit as a reason that statistical evidence fails to show pretext. *See, e.g., Pippin v. Burlington Res. Oil And Gas Co.*, 440 F.3d 1186, 1197–98 (10th Cir. 2006) (citing *Furr v. Seagate Tech., Inc*., 82 F.3d 980, 987 (10th Cir.1996); *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir.1994)); *Sanders v. Southwestern Bell Telephone, LP*, 544 F.3d 1101, 1110 (10th Cir. 2008).

6099791 (D. Kan., Oct. 7, 2022) and is pending in the other.

V. **CONCLUSION**

For all the reasons stated above, and in ECF Doc. 39, Defendant requests the Court enter summary judgment in its favor and enter judgment against Plaintiff.

Respectfully submitted,

McAnany, Van Cleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103
Telephone (913) 371-3838
Fax (913) 371-4722
Email: rdenk@mvplaw.com
slow@mvplaw.com

By: */s/ Spencer A. Low*
Ryan B. Denk     #18868
Spencer A. Low   #27690
*Attorneys for Defendant Unified Government of Wyandotte County / Kansas City, Kansas*

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that on the 10th day of March, 2023, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

Bert S. Braud
The Popham Law Firm, P.C.
712 Broadway, Suite 100
Kansas City, Missouri 64105
bbraud@pophamlaw.com

*Attorneys for Plaintiff*

/s/ *Spencer A. Low*